**<u>Exhibit A</u>**

# IN THE FAMILY COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| CHEYENNE GOODMAN | ) |
| | ) File No.:  CN23-01005 |
| Petitioner, | ) |
| | ) Petition No.: 23-00029 |
| v. | )             23-07261 |
| | ) |
| EDWIN LEÓN | ) |
| | ) |
| Respondent. | ) |

## COMMISSIONER'S ORDER
## PETITION FOR ORDER OF PROTECTION FROM ABUSE

Patricia Weir, Esq., for Petitioner
Kara Swasey, Esq., for Respondent
Vernon M. Vassallo, Esq. for Respondent

FITZGERALD, C.

I.   **PROCEDURAL HISTORY**

Cheyenne Goodman filed a Petition for Order of Protection from Abuse on January 3, 2023.[1]  Edwin León filed a cross Petition for Order of Protection from Abuse on April 12, 2023.

The Court heard Petitions 23-07261 and 23-07261 on April 26, 2023; May 17, 2023; May 24, 2023; and May 31, 2023.  Witnesses were sequestered at the start of the hearing.  The Court did not complete testimony on April 26, 2023, and ended the hearing after the direct examination and cross examination of Cheyenne Goodman.[2] The Court heard from Cheyenne Goodman, Cynthia Stettner, Emily C. S. Jones, Alex Faris, Timothy Powell, Roxanne Eastes, Christopher Lambe, Nehama Hanoch, and Edwin León.   Counsel for Edwin León filed a Motion to Dismiss on March 27, 2023. Counsel for Cheyenne Goodman filed an Answer to the Motion to Dismiss on April 6, 2023.  The Court consolidated[3] both Petitions for Order of Protection of Abuse and the Motion to Dismiss.[4]  A schedule for written closing arguments was established at the close of evidence along with supplemental briefing/memo on a discovery issue.[5]

---

[1] Ms. Goodman's PFA petition is comprised of at least 6-8 typed, single-spaced pages *in paragraph form* (with some bulleted lists) complete with dates and specific allegations of abuse.

[2] Witnesses who appeared at the courthouse on the first day of trial but did not get a chance to testify were offered the option of Zoom™ testimony.

[3] The Court frequently consolidates cross PFA petitions involving the same parties in the interest of judicial efficiency. In this matter, many of the allegations were based on the 2022 relationship of the parties and the events of December 16-17, 2022.

[4] The Court issued Interim Order(s) after the final temporary *ex parte* order expired.  Counsel for Respondent León was given opportunities to make an application on the record as to whether the Court should issue or extend the Interim Protective order(s). 10 *Del. C.* § 1043 (d); 13 *Del. C.* § 925; *Fam. Ct. Civ. R.* 65.2.

[5] The discovery issue dealt with an inadvertent disclosure of computer file. The last pleading regarding the discovery matter was submitted on July 3, 2023.

## II.     **DISCUSSION**

<u>Motion to Dismiss</u>

Counsel for Edwin León filed a written Motion to Dismiss at the direction of the Court after making an oral motion[6] at the March 17, 2023, hearing.  Counsel for Mr. León alleged that the Court did not have jurisdiction because there was no "substantive dating relationship"[7] between himself and Ms. Goodman.[8]  Mr. León subsequently filed a *pro se* Petition for Order of Protection of abuse (cross petition) alleging there was a substantive dating relationship between himself and Ms. Goodman.

Mr. León and Ms. Goodman engaged in a sexual relationship between June 2022 and December 2022. They both worked at the same law firm, Young, Conway, Stargatt, and Taylor[9] (hereinafter, "YCST") and took a Delaware bar review class.   At some point during their interactions, they both decided to study together. The study sessions were conducted at various places, including Mr. León's residence.  Mr. León took time off from work to study for the bar.  Ms. Goodman also took time off from her YCST internship. Both were not working and spent a considerable amount of time together studying for the bar exam.  Mr. León granted Ms. Goodman access to the residence by giving her keys and her own personal passcode (her birthday) to his alarm system.[10]  Mr. León granted

---

[6] The Court required that a written motion be filed because the oral Motion to Dismiss was made based on a deposition that occurred 2 days prior to trial.  The jurisdictional issue involved the definition of "substantive dating relationship" as defined by statute and caselaw.  10 *Del. C.* § 1041 (2)(b).

[7] "For purposes of this paragraph, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a substantive dating relationship. Factors to consider for a substantive dating relationship may include the length of the relationship, or the type of relationship, or the frequency of interaction between the parties."  *Id.*

[8] Ms. Goodman testified during a pre-trial deposition that she did not have a substantive dating relationship with Mr. León.

[9] YCST is not a party to this matter and any stay-away provisions from YCST are based on the standard stay-away (workplace) provisions of most PFA Orders (Form 454).  If Ms. Goodman is no longer employed at YCST, Mr. León may file a Motion to Modify the PFA Order.  10 *Del. C.* § 1045.

[10] Respondent's Exhibit #11 at 50.

Ms. Goodman permission to be at his residence when he was not there.[11]  Both Mr. León and Ms. Goodman exchanged gifts -- including inscribed books.[12]  Ms. Goodman testified that he got her a snake mug (because she had a pet snake).  Ms. Goodman testified that Mr. León bought foods for her that she would like and kept them in his house.  Ms. Goodman testified that he bought a blanket for her and the cinnamon candies that she liked.  Ms. Goodman gave Mr. León a tie pin, a grammar book, and a candle.  Mr. León gave her a vinyl Taylor Swift album.

Ms. Goodman cared for Mr.  León (at his request) after he had a medical procedure that required general anesthesia.  Ms. Goodman drove Mr. León back from the medical procedure and observed him while he recovered from the effects of the general anesthesia.[13]  Ms. Goodman got food for him after the procedure.  She basically was in charge of his brief convalescence.  Ms. Goodman also fed Mr. León's service animal when he was out of town at his residence.  Ms. Goodman testified that she would dog-sit his service animal for him.[14]

Ms. Goodman and Mr. León engaged in flirtatious dialogue[15] and would talk to each other on Snapchat.  They talked almost every day.  They would engage in FaceTime sessions. They would text each other.   Based on the communications between the parties, it appears that either Mr. León or Ms. Goodman spoke to each other as soon as

---

[11] Respondent's Exhibit #11 at 48.
[12] *Id.* at 399
[13] *Id.* at 426.
[14] *Id.* at 45.
[15] *Id.* at 230, 274, 277-278, 280, 341, 343

they woke up and before they went to bed.[16]  The couple exchanged phrases such as, "I love you," and "I miss you,"[17] while sending heart emojis.[18]

The couple planned movie nights together and went out to dinner on one occasion.[19] The couple shared many meals, including breakfast, lunch, and dinner where either party would pay for the takeout meals they consumed. Ms. Goodman testified that she sometimes spent the night at his residence.[20]  Ms. Goodman testified that they sometimes slept in the same bed.  Ms. Goodman testified that they studied together in the same room at his residence.  Sometimes they studied in separate rooms, but they still talked to each other by computer (direct messages).   Ms. Goodman said that they bantered about sexual things/preferences and would flirt with each other during their study periods.[21]

Mr. León and Ms. Goodman discussed whether they should be exclusive.[22] They contemplated ending or changing their relationship (to exclusivity or non-exclusivity).[23] Mr. León asked to meet her friends and her family.  The couple even discussed their feelings about marriage (in general) at one point.[24]  They sought to define their relationship as time passed.[25]  The relationship was not a public one, however, as they concealed it from their coworkers.[26]  The concealment of their relationship would later have a major impact on the events of December 2022.  The

---

[16] Respondent's Exhibit #11 at 82, 136, 188, 220
[17] Petitioner's Exhibit #3; Respondent's Exhibit #11 at 225, 227, 331, 366-367.
[18] Respondent's Exhibit #11 at 20, 32, 44, 71, 97, 242, 351, 355, 363, 384.
[19] Id. at 95.
[20] Id. at 98-99, 281.
[21] Id. at 192.
[22] Id. at 191, 250-251.
[23] Id. at 247-248.
[24] Id. at 313-314.
[25] Id. at 100, 106, 190-192, 222-226, 322, 361, 413
[26] Id. at 276

couple also engaged in multiple breakups only later to make up and resume their relationship.[27]  Their interactions and conversations were that of a couple in a relationship.[28]

The Court finds that Ms. Goodman and Mr. León were in a "substantive dating relationship" as defined by the *Delaware Code*.[29]   Mr. León provided sworn testimony during the PFA trial that he and Ms. Goodman had a "substantive dating relationship," even though he (through counsel) had previously filed a Motion to Dismiss.[30]  Given this fact, Mr. León's subsequent *pro se* filing of a PFA against Ms. Goodman is troublesome and deserves scrutiny.  Jurisdiction works both ways.  The Motion to Dismiss is **DENIED**.

PFA TRIAL

Cheyenne Goodman

Cheyenne Goodman testified on April 26, 2023.  At the beginning of her testimony, Ms. Goodman explained that she was on took Zoloft™ in the morning and Xanax™ at night, but that she had not taken any medications in anticipation of testifying in Court.  Ms. Goodman also took other medications for cystic fibrosis.  Ms. Goodman stated that she had a PTSD diagnosis.  In general, Ms. Goodman said she felt apprehensive talking about issues while others were in the courtroom.

Ms. Goodman testified she started her internship at YCST in January 2022 and that the internship ended in April 2022.  Ms. Goodman stated that her relationship with Edwin León began toward the end of her internship in April 2022.  At the time their

---

[27] Respondent's Exhibit #11 at 338, 399-400, 413.
[28] *Swanson v. Davis*, 69 A.3d 372 (Del. 2013).
[29] 10 Del. C. § 1041 (2) (b).
[30] 10 *Del. C.* § 1041.

relationship began, Ms. Goodman was an Intern and Mr. León was a Law Clerk.  Ms. Goodman got an offer to start employment at YCST in August 2022.   Ms. Goodman testified she had a discussion with Mr. León about not keeping the relationship going when she started at the firm in August.  Ms. Goodman testified that they discussed how to maneuver the workplace if they were in a relationship.

Ms. Goodman stated that when she started to work at the firm, Mr. León would get angry and demeaning.  Ms. Goodman testified there were times when Mr. León seemed jealous and controlling.  Ms. Goodman believed Mr. León was jealous of the time she spent with others and the lack of time she had for him.  Ms. Goodman testified about a work conflict in August 2022 when Mr. León got angry about her contact with a coworker that he did not like.  Ms. Goodman stated that Mr. León would call her late at night to give her a work project, and that he would expect the project to be completed the very next day.[31]   Ms. Goodman felt pressured by Mr. León and occasionally tried to lessen her contact with him outside of work.

Ms. Goodman testified that they had a sexual intercourse frequently and that she slept over at his home.  Ms. Goodman testified that Mr. León wanted to introduce her to others as his girlfriend.  Mr. León wanted to go on a vacation with her to London.[32]  Ms. Goodman testified that Mr. León asked her to move in with him.  Ms. Goodman testified that Mr. León would constantly ask if they were exclusive.

Ms. Goodman testified that Mr. León would make comments regarding marriage, but that she was reluctant to talk about the subject.  Ms. Goodman testified that he looked at one of her postings on Pinterest, a "wedding board" that she had posted.  Ms. Goodman

---

[31] Petitioner's Exhibit #6.
[32] Respondent's Exhibit #11 at 427.

testified that he looked at the wedding board and sent her a picture of a wedding ring.[33] Ms. Goodman wondered whether she, herself, was actually a strong proponent of the idea of marriage in general.   Ms. Goodman testified that Mr. León would blow off her reluctance about marriage and attribute it to her youth.[34]

Ms. Goodman testified that Mr. León had sexual preferences that she did not share.   Ms. Goodman testified that he introduced things into the relationship like belt hitting and tying her up. Ms. Goodman testified that during sex that he would place his hands around her neck initially, and that after a period of time, he would squeeze.  Ms. Goodman also testified that he would tie her up during sexual intercourse.  Ms. Goodman said Mr. León was much more into oral sex than she was and would get upset with her when she did not perform oral sex for him.   Ms. Goodman testified that their sexual relationship was initially totally consensual and then became somewhat forced.   Ms. Goodman testified that there were things in their sexual relationship that made her uncomfortable.   Ms. Goodman was concerned that YCST would move to get her fired if they found out about their sexual relationship.  Ms. Goodman testified that her mentor at YCST, Christopher Lambe, asked whether she was in a relationship with Mr. León after Mr. Lambe witnessed one of their workplace interactions (an interaction Ms. Goodman characterized as a "hazing" session).

Ms. Goodman testified about an incident in November of 2022 at Mr. León's house. Ms. Goodman stated that the incident started after an argument in his home office.   Ms. Goodman testified that Mr. León talked about getting married and that he wanted eventually to have kids.  Ms. Goodman testified that Mr. León was angry because he

---

[33] Respondent's Exhibit #11 at 443.
[34] Respondent's Exhibit #11.

thought he was compromising too much in the relationship and that she was not compromising enough. Ms. Goodman said they walked from the office to the bedroom and that they had a bear hug. Ms. Goodman said that Mr. León then asked her, "Would you lay with me for a while?"  After a period of time, Ms. Goodman said that Mr. León crawled on top of her and straddled her. Ms. Goodman testified that Mr. León strangled her as his hands were around her neck and he squeezed. Ms. Goodman said her vision went white. Ms. Goodman said she tried to peel his hands off. Ms. Goodman said she tried to slap his hands away.  Ms. Goodman stated there were two attempts at strangulation. Afterwards, Mr. León lay next to her and stroked her hair. Ms. Goodman said she wanted to end contact with Mr. León and that she tried not to talk to him in person after this incident.

Ms. Goodman testified that their November incident was different from their prior sexual encounters where he would place his hands around her neck. In their previous encounters, when Mr. León had his hand around her neck, he would not squeeze and she would put her hand over his hand to make herself more comfortable. Ms. Goodman testified that in other episodes, he would later tie her up and that she was unable to put her hand over his hand during sex.   Ms. Goodman was afraid that Mr. León would be triggered by her rejecting him. Ms. Goodman testified that this was one of his triggers, the idea of rejection. Ms. Goodman testified that she tried to make excuses not to spend time with him after this incident.  Ms. Goodman also sent articles to Mr. León about sexual coercion around this time.[35]   Ms. Goodman said that Mr. León did not respond to the articles she sent him.  Ms. Goodman testified they had one phone call about the sexual

---

[35] Petitioner's Exhibit #3.

coercion issue.  Nevertheless, Ms. Goodman testified they spent Thanksgiving together and had sexual intercourse.

Ms. Goodman testified about a Target™ toy drive[36] on Friday, December 16, 2022. Ms. Goodman testified that the plan was to go to the toy drive and meet coworkers afterwards in Philadelphia.  During the toy drive, Mr. León had indicated that he loved her and that he wanted to spend the night with her.  Ms. Goodman said she planned to take an Uber™ home from Philadelphia with Nehama Hanoch.  Ms. Goodman drove to the toy drive by herself.  Ms. Goodman testified that while in Philadelphia the group went to a speakeasy, a bar called Devil's Alley, and then another place called Woody's.

Ms. Goodman testified that she sent flirtatious messages[37] to Mr. León during the night out in Philadelphia.  Ms. Goodman testified that she messaged him that he looked nice and that she wanted to have sex with him.[38]  Ms. Goodman testified that she sent Mr. León these messages because she did not want him to feel rejected or upset.  She did not want conflict with Mr. León.   Ms. Goodman explained that she planned to use Nehama Hanoch as an excuse as to why she would not sleep with Mr. León that night. Ms. Goodman figured that Mr. León would not be upset with her because she appeared to be receptive to him during the night.

Ms. Goodman testified that toward the end of the night that they used two separate Ubers™ to go to Woody's.  Ms. Goodman testified that Emily C. S. Jones, Timothy Powell, and Nehama Hanoch were in one Uber™ while she was in the other.  Ms. Goodman testified that while at Woody's, she tried walking away from Mr. León, but he kept

---

[36] *Id.*
[37] Respondent's Exhibit #2
[38] *Id.*

following.   Ms. Goodman testified that they were dancing and drinking.   Mr. León

attempted to dance with her.   Mr. León had texted her during the night and inquired as to

whether she was wearing any underwear.   Ms. Goodman testified that at one point Mr.

León tried to get inside her bathroom stall as she was going to the bathroom.    Ms.

Goodman testified she kissed Mr. León while at Woody's and that she put her hand on

his chest. Ms. Goodman said that she did these things because she did not want him to

that she had rejected him. Ms. Goodman testified that a Woody's bouncer got angry at

her because she attempted to enter or exit the building through the wrong door.    Ms.

Goodman said Mr. León confronted the bouncer because he had spoken to her in a rough

manner about using the wrong exit door. Ms. Goodman stated  Ms. Jones and Hayden

had offered to drive her home, but she declined.  Ms. Goodman decided she wanted to

leave Woody's and get some food. Mr. León brought her jacket to her outside of Woody's.

Ms. Goodman testified that she left the group outside of Woody's to go across the

street to talk to a woman with pink hair. Ms. Goodman testified that she had removed a

pocket knife that she had hidden in her boot and clipped it to her skirt while outside of

Woody's.  Ms. Goodman explained that she often carries this pocket knife as it was a gift

from her father. Ms. Goodman testified that she walked away from the group and told Mr.

León that she was fine and that she would get an Uber.™ Ms. Goodman told Mr. León

that she knew the city and was fine walking by herself as she had previously lived there.

Ms. Goodman said that Mr.  León decided to walk behind her and to follow her.

Ms. Goodman asked Mr. León to stop following her.  Mr. León refused and continued to

follow her. Ms. Goodman ran. Mr. León chased. Ms. Goodman testified that Mr. León

grabbed her arm and tried to stop her. Ms. Goodman told Mr. León, "Please stop chasing

me," and "Please stop grabbing me." Mr. León told her that he would drive her home. At some point, Ms. Hanoch texted her and Ms. Goodman replied: "I'm trying to get away from Edwin," and "He's following me."[39]    Mr. León later sat on a step and touched his chest and said, "I'm having a heart attack."   Ms. Goodman dialed '911' because she was so concerned about whether he was having a heart attack.  Mr. León got up.  Apparently, Mr. León had faked the heart attack.  Mr. León started running after her and trying to grab her.  At the end of the pursuit, Ms. Goodman said she started to hyperventilate and have a panic attack.  Ms. Hanoch told her to put her head between her knees and try to calm her down.  Ms. Goodman, eventually walked to Hayden's car with a small group.  Emily Jones and Hayden drove her and Ms. Hanoch home.

Ms. Goodman testified that she called Mr. León later (late night/early morning of December 17th).  Ms. Goodman was afraid that Mr. León was going to be angry.  They discussed the events of the prior evening.  Ms. Goodman testified that one of their phone calls lasted approximately 2 hours because she left the phone on and fell asleep.  Ms. Goodman testified that Mr. León was upset and said, "Why did you let people see that you were afraid of me?"  Mr. León blamed her for having a panic attack and reacting the way that she did.  Mr. León portrayed himself as the victim.  Mr. León claimed that he had been scarred or scratched in the face by Ms. Hanoch.  Mr. León said he would have a permanent face scar as a result of Ms. Hanoch's attack.

Later, on December 17, 2022, Mr. León insisted that they talk in person.[40]  Ms. Goodman went to Mr. León's residence early Saturday afternoon.  Once she entered Mr. León's residence, she left her bag at the front door with her phone inside.  Ms. Goodman

---

[39] Petitioner's Exhibit #10; Respondent's Exhibit #4.
[40] Petitioner's Exhibit #3.

said she left her phone inside her bag because she did not want to get into an argument with Mr. León about him checking her phone.   Mr. León sat with Ms. Goodman and tried to calm her down. Mr. León got her coffee and ordered food. Ms. Goodman testified that she was crying softly and that Mr. León rubbed her back. Ms. Goodman testified that Mr. León offered her medicine to calm her down.

The night of December 16, 2022, Ms. Goodman had lost her earring.   Ms. Goodman woke up and found that her ear had been sore and red.  The post of the earring was still there but the earring was missing.   Ms. Goodman suspected that the earring may have been ripped out of her ear.    Ms. Goodman testified that Mr. León had the earring and offered it to her on December 17, 2022. Ms. Goodman asked Mr. León how she'd lost the earring and Mr. León told her that she didn't even remember how she'd lost it.  Mr. León said that he picked the earring up for her and gave it back to her.  Ms. Goodman took pictures of her ear a couple of days afterwards on December 20, 2022.

Ms. Goodman testified that she stayed on the couch with Mr. León for a while and then went back upstairs to his bedroom. While upstairs, they sat on his bed and talked about the night before.  Mr. León reiterated how upset he was that everyone saw her reaction (afraid of him) and began chastising her about her behavior. Ms. Goodman testified that she brought up the previous conversation about sexual coercion. Mr. León then insisted that she needed to contact people and set the record straight. Mr. León threatened that if she did not, he would file a civil suit against Ms. Hanoch and report her to the police. Mr. León indicated that if this came out, all would know they we had been in a sexual relationship with each other.  Mr. León requested that Ms. Goodman execute

an affidavit. Mr. León threatened that if she did not execute an affidavit, he would report Ms. Hanoch for professional discipline/disbarment.

Ms. Goodman walked downstairs to send text messages to others that she was OK. Ms. Goodman testified that she didn't understand herself why she didn't just leave at this point.[41] Mr. León had not physically prevented her from leaving and she could have taken her bag and her keys on her phone and left the residence. Ms. Goodman testified that this was the type of control she felt Mr. León exercised over her. The food came and Mr. León tried to get her to eat. At some point, they returned upstairs.

Mr. León told her that she needed to learn to compromise. and They continued to argue. Mr. León told her that he needed and wanted sex to calm down. Mr. León was angry that she chose her friends and Ms. Hanoch over him. Mr. León indicated that now she needed to prove that she cared about him and that they should engage in sexual relations, specifically oral sex. Ms. Goodman testified that she went to the bathroom and started to run water in order to calm down. Mr. León followed her into the bathroom and pushed her against the bathroom counter. Ms. Goodman testified that he tried to initiate sex but she said, "No." Mr. León insisted that she perform oral sex on him. Ms. Goodman testified that he took off her sweatshirt off and that she did lift her arms for the sweatshirt to be taken off. Ms. Goodman testified that he pushed her down so that she was on her knees so that she could perform oral sex on him. Ms. Goodman testified that while she was on her knees she said, "No." and she closed her mouth shut. Ms. Goodman said that Mr. León put his hands on her jaw and forced himself on her. Ms. Goodman testified that he grabbed her head and forced her mouth open. Ms. Goodman said that she

[41] The Court noted that Ms. Goodman was very emotional during this portion of her testimony (blaming herself) and appeared to be re-experiencing a traumatic event.

begged him not to come to completion.  Ms. Goodman testified that once he came to completion, she spit out the ejaculate in the shower.  Ms. Goodman testified that they had oral sex before, but he had never done it before as a means of "punishment."  Ms. Goodman testified that she laid down with him for a while afterwards and that she eventually told him that she had to text her mom.  Ms. Goodman went downstairs to text her mom and indicated that she was OK and that she tried to keep him calm.  Mr. León continued to stress that he had leverage over Ms. Hanoch and that he wanted the record set straight.  He gave her a deadline to set the record straight.  Mr. León looked at her phone and the group chat and gave her a deadline to fix it.  Afterwards, Ms. Goodman went to her mother's house.  She was crying. She did not want to cry in front of her mother, but she couldn't help herself.

Ms. Goodman stated that she had been working with the police in Pennsylvania. On December 29, 2022, she initiated a recorded call (with police assistance) with Mr. León as part of their investigation.  Ms. Goodman said two SVU (Special Victim's Unit) detectives gave her instructions on how to talk to Mr. León and to keep the dialogue open. During the phone call, Mr. León said, "I sent a letter to you." and "You will find it."  Ms. Goodman testified that Mr. León was evasive in the phone call with police.  Mr. León claimed during the call with police that the call was dropping out or that he couldn't hear her.  Ms. Goodman testified there was no definitive disclosure by Mr. León the recorded phone call with the police.  Ms. Goodman testified she discovered in January 2023 that Mr. León had left her a letter as a part of the editing feature/process in Google™ Docs. The couple had used Google™ Docs during their bar study period to do legal outlines.

On cross examination, Ms. Goodman categorically denied the abuse allegations made against her in Mr. León's cross petition.   Ms. Goodman testified she never threatened Mr. León that her father would harm or kill him.   Ms. Goodman stated that there was a joke between them that if he had tried to hit on his mother, and her dad found out, he would kill him.   Ms. Goodman testified that her father was not a convicted criminal and that he never threatened to harm Mr. León.   Ms. Goodman stated that she never threatened Mr. León with a knife. Ms. Goodman testified that she does not have a "Harry Potter" fantasy.  Ms. Goodman testified that she never struck Mr. León in the face.  Ms. Goodman testified that she did not leave bite marks on Mr. León's chest or his shoulder. Ms. Goodman testified that she never scratched Mr. León in anger, but may have scratched him during sex, inadvertently.  Ms. Goodman testified that she never assaulted Mr. León with a wand.  Ms. Goodman testified that she never anally penetrated Mr. León. Ms.  Goodman said she never threatened to tell third parties about Mr. León sexual preferences or that he had been assaulted by her.  Ms. Goodman testified that she never threatened to sleep with others if he didn't call her back.  Ms. Goodman testified that she never threatened to tell coworkers about his sexual preferences.  Ms. Goodman testified that she never took unwanted pictures of Mr. León and threatened to expose those pictures. Ms. Goodman admitted that she did make fun of a pair of Mr. León's suspenders and had taken a picture of them.  Ms. Goodman admitted that she did send Mr. León articles about sexual coercion.  Ms. Goodman stated that she never insulted Mr. León's level of English proficiency.[42]  Ms. Goodman testified that she never refused to leave his residence.  Ms. Goodman stated that after one argument, Mr. León locked himself in his

---

[42] Respondent's Exhibit #11 at 237-239.

bathroom and that she eventually went downstairs and slept on the couch. Ms. Goodman said she never threatened or blocked Mr. León's egress from his residence. Ms. Goodman testified that Mr. León never had to shut the door on her to escape her. Ms. Goodman testified that she never spread rumors to his coworkers or threatened to spread rumors to his coworkers that he was either gay or liked anal penetration. Ms. Goodman testified that she did tell Ms. Hanoch about some of his sexual practices/preferences. Ms. Goodman testified that she never had put a PFA on others in the past or had a PFA put out on her. Ms. Goodman testified that Mr. Leon contacted her family.[43]

Cynthia Stettner

Cynthia Stettner testified[44] on May 17, 2023. Ms. Stettner worked as an ER[45] nurse and a Certified Legal Nurse Consultant[46] for the past 17 years. Ms. Stettner testified that she was a Forensic Nurse Examiner[47] and had dealt with victims of many sexual assault cases. Ms. Stettner reviewed the PFA petition filed on January 1, 2023, along with deposition testimony and photos taken by Ms. Goodman. Ms. Stettner also reviewed earlobe and arm photos taken by Ms. Goodman. Ms. Stettner testified that the photos that she reviewed were taken by Ms. Goodman on December 20, 2022. Ms. Stettner testified that the earlobe photos looked more like an injury from a pressure injury rather than an ear ripping injury.[48] Ms. Stettner testified that in her expert

---

[43] Petitioner's Exhibit #11. The Court allowed a statement by Ms. Goodman's mother. The statement was not entered for the truth of the matter asserted and demonstrated that Ms. Goodman was on notice that Mr. León was trying to contact her family members. The statement was also an indication of Ms. Goodman's and her mother's state of mind pursuant to Rule 803 (3).

[44] Ms. Stettner was a witness for Mr. León who testified by Zoom. Ms. Stettner was allowed to testify during Ms. Goodman's case-in-chief due to her work schedule.

[45] Respondent's Exhibit #3.

[46] *Id.*

[47] *Id.*

[48] Petitioner's Exhibit #2.

opinion, the picture taken by Ms. Goodman was not the picture of an injury that occurred from a "rip" as that injury would present (appear) a couple of days later. Ms. Stettner testified that there could have been a pressure type injury behind the earlobe on the neck area which would have indicated a pressure type injury to Ms. Goodman's ear. There were no photos of this area.

Ms. Stettner also reviewed a photo of the arm[49] that appeared to have a circular black bruise. Ms. Stettner testified that when an individual is grabbed by an assailant, there is usually a "pattern injury" in which you could see four fingers on one side of the arm. Ms. Stettner testified that the small round bruise was not consistent with the "grabbing injury" as it was only one circular bruise, on one side of the arm. Ms. Stettner testified that the bruise[50] in IMG .7196 was not consistent with a pattern bruise but more like a "pinch mark" bruise. Ms. Stettner said this bruise was not consistent with an injury seen in a "grabbing type" injury. Ms. Stettner testified that the bruise in IMG .7196 also appeared yellow in presentation, and it was most likely in late stage of healing.[51] According to Ms. Stettner, this injury most likely occurred at a different time than the injury in IMG .7211.[52] Ms. Stettner testified that the injury in IMG .7211 was black/purple and that it was only in the beginning stages of healing. [53] Ms. Stettner testified that this injury had probably occurred within the last 48 hours.

Ms. Stettner testified that the most common types of injury for victims forced to engage in oral sex were absent in the pictures she examined. Ms. Stettner said that

---

[49] Petitioner's Exhibit #5.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*

Ms. Goodman did not appear to have any signs of oral hemorrhaging or damage to the gums or the soft palate of the mouth. Ms. Stettner testified that you would most likely see a "squeezing" or "grabbing type" injury along the mouth. Ms. Stettner testified that forced oral sex requires a great amount of force to overcome the closing efforts of the mouth.

Ms. Stettner did not observe any petechial hemorrhaging that would be consistent with each strangulation injury mentioned in the PFA petition. Ms. Stettner testified that if an individual lost consciousness, that individual would likely require medical attention. There was no indication that Ms. Goodman sought medical attention after being strangled and blacking out. Ms. Stettner admitted that she did not conduct an examination of Ms. Goodman. Ms. Stettner testified that if she had conducted an examination of Ms. Goodman, she would have also taken different types of pictures (not the selfies taken by Ms. Goodman's cell phone camera) based on her professional experience.

Timothy Powell

Timothy Powell testified at the hearing on May 17, 2023. Mr. Powell worked with Ms. Goodman at YCST. Mr. Powell had been an associate at YCST for the last four years and his employment predated that of Ms. Goodman and Mr. León. Mr. Powell was present on the night of December 16- 17, 2022, in Philadelphia. Mr. Powell testified that Roxanne Eastes, Nikita Eastes (Roxanne's sister), Alex Faris, Carol Thompson, Edward León, and Nehama Hanoch were also present. Mr. Powell testified that they had dinner somewhere on 18th St. next to an establishment called "Green Eggs and Hogs" (sp). Mr. Powell testified that he sat next to Ms. Goodman during the

dinner and that everyone had been drinking during dinner.  Mr. Powell testified that the group tried to go to a speakeasy called Booker's but that it was full.  Mr. Powell testified they went to a bar for 1-2 hours where they had drinks and shots.  Mr. Powell testified the group went to Woody's and spent the rest of the night there.  Mr. Powell said Mr. León and Ms. Goodman were at Woody's.  They wandered off from the main group.  Mr. Powell testified that they seemed to leave together and were also seen on the dance floor.  Mr. Powell said that he left Woody's with Alex Faris, Roxanne Eastes, Nikita Eastes, and went on a journey to Alex's car.  The group ended up at City Hall and saw Ms. Goodman, Emily C. S. Jones, and Nehama Hanoch.  Mr. Powell testified that when they arrived, he saw Ms. Goodman sitting on a sidewalk, having an apparent panic attack.  Mr. Powell stated Ms. Goodman was having trouble breathing, she was crying, and she could not talk.  Mr. Powell testified that he'd heard what happened and he looked for Mr. León.   Mr. Powell looked up and saw that Mr. León was talking to the police.  Mr. Powell testified that he confronted Mr. León.  Mr. León told him that he had been dating Ms. Goodman for six months.  Mr. Powell did not believe Mr. León.  Mr. Powell testified that they began shouting at each other and that the police noticed.  Mr. Powell testified that Mr. León offered to share his phone with him to prove that he had been in a relationship with Ms. Goodman.  Mr. Powell did not take him up on his offer.  Mr. Powell said he tried to comfort Ms. Goodman and told her that everything would be all right.

On cross examination, Mr. Powell testified that he did not know that Ms. Goodman and Mr. León had been in a relationship prior to December 16, 2022.  Mr. Powell testified that he had produced copies of text messages based on a subpoena

from Mr. León.  Mr. Powell testified that he did see Ms. Goodman and Mr. León
sneaking off together and that he had no idea why they had been sneaking off together.
Mr. Powell testified that no one told him to keep Mr. León and Ms. Goodman apart that
evening.  Mr. Powell denied seeing any type of assault.  Mr. Powell testified that he did
see a red mark on Mr. León's face and that he told Ms. Hanoch that he hoped that mark
was from her. Mr. Powell testified that he did see the police hand Mr. León a pink slip of
paper.  Mr. Powell stated that Mr. León did send him the Answer to the Motion to
Dismiss filed by Ms. Goodman in this PFA litigation.

Alex Faris

On May 17, 2023, Alex Faris testified that he had been employed at YCST and
was a friend and coworker to Ms. Goodman and Mr. León.  Mr. Faris was at the outing
on December 16-17, 2022.  Mr. Faris said that Ms. Goodman, Mr. León, Roxanne
Eastes, Carol Cox, Nikita Eastes, Nehama Hanoch, and Timothy Powell were also
present.  Mr. Faris said he sat across the table from Ms. Goodman at dinner.  Mr. Faris
sat next to Mr. León.  After dinner, the group went to a sports bar and were joined by
Emily Jones and her fiancé (Hayden).  Mr. Faris testified that they also went to another
bar called Woody's.  Mr. Faris stated that he stopped drinking at Woody's.  Mr. Faris
said that he left Woody's with Roxanne Eastes and her sister Nikita and they began
walking back to the midtown parking garage.  Mr. Faris testified that he ended up near
City Hall.  Mr. Faris did not see any assault but that upon arriving at City Hall, but he
saw Emily C. S. Jones and Ms. Goodman.  Mr. Faris testified that Ms. Goodman was on
the ground and that she was crying and upset.  Mr. Faris was told that there had been
an altercation involving Mr. León and that Mr. León had walked off.  Mr. Faris and Mr.

Powell walked toward Mr. León.  Mr. Faris said that Mr. León told them that he had been dating Ms. Goodman for about six months.  Mr. Faris also testified that Mr. León said that Nehama Hanoch had attacked him and that he was making a police report. Mr. Faris testified that he did not believe that Mr. León and Ms. Goodman had been dating for six months.  Mr. Faris said that Mr. León invited them to look through his cell phone.  Mr. Faris also declined.

On cross examination, Mr. Faris testified that he had a cordial relationship with Mr. León.  Mr. Faris identified a group text which said, "Come outside Shay got kicked out."  Mr. Faris testified that he went outside (Woody's) but he did not see Mr. León.  Mr. Faris denied that he said, 'You have no friends here,' and, 'It won't go well if you file a report.' to Mr. León.  Mr. Faris also denied hearing someone saying, 'not to trust Josh Brooks,' about this incident.  Mr. Faris testified that he was about 10 feet away from Ms. Goodman when he observed her on the ground while she was crying.  Mr. Faris testified that he did see a scratch on Mr. León's face.  Mr. Faris testified that he was told Ms. Goodman was assaulted by Emily Jones.

Emily C. S. Jones

Emily C. S. Jones testified that she had been associated with YCST since August of 2022.  Ms. Jones testified that she did not go to dinner but arrived at the bar later with her and her fiancé, (Haden).  Ms. Jones testified that Cheyenne Goodman, Edwin León, Nehama Hanoch, Timothy Powell, Alex Faris, Carrol Cox and Roxanne Eastes were present when she arrived that night.  Ms. Jones testified that they took two Ubers™ to Woody's and that everyone but Carrol Cox attended.   Ms. Jones said she spent most of her time at Woody's with Roxanne Eastes.  Ms. Goodman said she was hungry, and Ms.

Jones offered to drive Ms. Goodman and Ms. Hanoch home while stopping for food on the way. Later, Ms. Goodman texted and called her to say that she was outside of Woody's. Ms. Jones testified that Mr. León said that Ms. Goodman got kicked out of Woody's. Ms. Jones testified that she saw both Ms. Goodman and Mr. León outside of Woody's.

Ms. Jones testified that Ms. Goodman started walking away and that Mr. León followed her. According to Ms. Jones, everyone said Mr. León would get Ms. Goodman home. Ms. Jones testified that she told Mr. León to text her when Ms. Goodman gets home safe. Ms. Jones and testified that she lost sight of them in the crowd outside of Woody's but that her fiancé (Hayden) tried to go after Ms. Goodman. Ms. Jones testified that her fiancé returned after about 30 seconds. Ms. Jones testified that Ms. Hanoch got a phone call sometime later. Ms. Jones overheard Ms. Hanoch saying, "Who was chasing you?" and, "We will come and get you." Ms. Jones also overheard the words "city hall." Ms. Hanoch said, "We need to go and get Cheyenne." Ms. Jones overheard crying on the telephone. Ms. Hanoch said Mr. León was chasing Ms. Goodman. Ms. Jones testified that they (herself, Ms. Hanoch, and Hayden) ran towards City Hall. Ms. Jones testified that Ms. Hanoch ran across the street.

Ms. Jones saw that Ms. Goodman was on the ground, shaking, curled up, with her knees almost tucked to her chest. Ms. Jones described Ms. Goodman as struggling to breathe. Ms. Jones got on the ground next to Ms. Goodman and tried to comfort her. Ms. Jones said that Ms. Goodman could not speak and that she was scared for her. Ms. Jones then heard yelling behind her. When Ms. Jones turned around, she saw Mr. León and Ms. Hanoch in a face-to-face confrontation. Ms. Jones said she heard Ms. Hanoch

say, "Stay away." from Ms. Goodman.  Ms. Jones suggested to Ms. Hanoch that she stop confronting Mr. León and that they check on Ms. Goodman.  Ms. Jones testified she did not see any assault.  Ms. Jones testified that Mr. León walked off saying something about a "police report."

Ms. Jones testified that Timothy Powell, Alex Faris, Roxanne Eastes, and Nikita Eastes arrived at the scene.  Ms. Jones told this group that Ms. Goodman was not okay that something had happened.  Later, they went to Hayden's car and Hayden drove them back to their homes.   During the car ride home, Ms. Jones attempted to talk to Ms. Goodman in an effort to calm her down. They talked about Taylor Swift and her pet snake. Ms. Jones also said she heard conversation in the back of the car about 'being followed' and something about 'grabbing her.'  Ms. Hanoch and Ms. Goodman were dropped off at their shared apartment building.

On cross examination, Mr. Jones stated that she had no prior knowledge of the dating relationship between Mr. León and Ms. Goodman. Ms. Jones testified that she had not talked to Ms. Goodman about that relationship. Ms. Jones didn't recognize the text "come outside" and, "she got kicked out". [54]  Ms. Jones did not recall any text messages that indicated that Ms. Goodman may have had too many drinks.  Ms. Jones did not see Ms. Goodman take any Xanax.™  Ms. Jones did not hear Ms. Goodman complain of ear pain or bleeding during the night out in Philadelphia.  Ms. Jones testified that she may have spoken to Mr. León on the phone, but she did not recall who initiated the call(s). Ms. Jones did not recall Mr. León saying to her, "She got kicked out." or that Ms. Goodman may have been kicked out for being too intoxicated.  Ms. Jones testified that she did not

---

[54] Respondent's Exhibit #6.

call the police during the night of December 16-17, 2022. Ms. Jones testified that the plan was for her to drive Ms. Hanoch home. Ms. Jones testified that she did not hear Ms. Hanoch yell that her friend had been 'sexually assaulted' or 'was being sexually assaulted.'

Ms. Jones testified that she did not ask Mr. León what had happened. Ms. Jones testified that when she saw Ms. Goodman on the ground and that she was concerned that she was injured. Ms. Jones did testify that she thought it was reasonable for Mr. León or her fiancé to follow Ms. Goodman. Ms. Jones testified that she did not hear Nehama Hanoch say 'murder him' or that she would get Jesse flowers to murder him. Ms. Jones stated that she did hear Ms. Hanoch say, "Stay away from her." Ms. Jones testified she did not believe that she said 'Edwin León assaulted Cheyenne' to either Mr. Faris or Mr. Powell. Ms. Jones stated that when she saw Ms. Goodman on the ground, she got the impression that Mr. León had scared her in some way or had possibly touched her/her hurt her in some way. Ms. Jones testified that Ms. Goodman did not say 'don't trust Josh Brooks.' Ms. Jones testified that the journey from Woody's to City Hall took about 15-20 minutes. Ms. Jones testified that it took less than a minute for Hayden to came back after trying to follow Mr. León and Ms. Goodman.

Roxanne Eastes

Roxanne Eastes testified at the May 24, 2023 hearing. Ms. Eastes testified that she was an associate at YCST since September 2020. Ms. Eastes was present at the dinner and night out in Philadelphia on December 16-17, 2022. Ms. Eastes said that she did notice that Ms. Goodman had been drinking throughout the night. Ms. Eastes did not see Ms. Goodman demonstrate any ear pain or bleeding from the ear. Ms.

Eastes testified they went to a second bar called Woody's and they exited Woody's between 12:00 and 1:00 a.m.  Ms. Eastes testified that she did not know whether Ms. Goodman or Mr. León were in relationship until December 2022.  Ms. Eastes next saw Ms. Goodman in front of City Hall with Emily Jones, Hayden Shugg (sp), and Nehama Hanoch.   Ms. Eastes observed Ms. Goodman sitting, holding her knees, with her arms crossed.  Ms. Eastes described Ms. Goodman as crying and looking as if she was in shock.  Ms. Eastes said that Ms. Goodman's shoulders were heaving and that she looked flustered and terrified.   Ms. Eastes said that Ms. Goodman repeated, "No…no… no, I didn't want to go."   Ms. Eastes told Ms. Goodman, "It's OK, you're safe." and held her while stroking her hair to comfort her.  On cross examination, Ms. Eastes testified that Ms. Goodman never said she was sexually assaulted.  Ms. Eastes was on December 17, 2022, group text that read, "It was a disgusting thing to try to force Ms. Goodman into her car and that Edwin should be blocked and ignored (presumably, off the group chat)." [55]  Ms. Eastes spoke to Ms. Goodman on December 17, 2022, by phone.  Ms. Goodman told Ms. Eastes that Mr. León attempted to force her into a car and that she ran away but he followed her and tried to grab her.  Ms. Eastes did not speak to Mr. León about the incident but received a text from him over the weekend.  According to Ms. Eastes, Ms.Goodman expressed that if she had gotten into the car, Mr. León would have raped her.

Christopher Lambe

Christopher Lambe testified at the hearing on May 24, 2023.  Mr. Lambe is an Associate in the bankruptcy section at YCST and began working at the firm in

---

[55] Respondent's Exhibit #8.

September 2020.  Mr. Lambe was not aware of a dating relationship between Mr. León and Ms. Goodman until December 2022.  In October 2022, Mr. Lambe asked Ms. Goodman if she was in a relationship with Mr. León after observing a workplace interaction between the parties.  Ms. Goodman denied it.  Mr. Lambe spoke to Timothy Powell and Roxanne Eastes on December 17, 2022, about the incident of December 16-17.[56]    Ms. Eastes informed Mr. Lambe that there was no suspected rape, but an assault of some sort.  Ms. Eastes also told Mr. Lambe that Nehama Hanoch may have struck Mr. León and that a police report may have been made.  Ms. Eastes told Mr. Lambe that 'no' did not matter to him (Mr. León) and that once she (Ms. Goodman) got into the car 'no' would not have mattered.  Mr. Lambe also spoke to Ms. Goodman on Sunday, December 18, 2022.  Ms. Goodman told him about Mr. León's attempts to grab her and force his way into the bathroom stall.  Ms. Goodman told Mr. Lambe that Mr. León chased her but then clutched his chest as if he was having a heart attack.  Mr. Lambe asked Ms. Goodman if she was raped.  In response to this question, Ms. Goodman broke down and sobbed uncontrollably.  Ms. Goodman told him that Mr. León had been trying to get her to execute an affidavit.  Mr. Lambe asked Ms. Goodman if she had signed an affidavit.  Ms. Goodman indicated that she had not.  On Sunday, December 18, 2022, Mr. Lambe drove Ms. Goodman to the police station in Plymouth Meeting, PA so that she could file a police report.  Mr. Lambe testified that he did raise concerns that Mr. León had unrealistic expectations surrounding her work product.

---

[56] Respondent's Exhibit #5.

<u>Nehama Hanoch</u>

Ms. Nehama Hanoch testified on May 24, 2023. Ms. Hanoch testified that she considered Mr. León to be almost like a brother and a trusted friend up until September 2022, when he made comments to her at a dinner.[57]   Ms. Hanoch testified that Ms. Goodman started up again at YCST in August of 2022. Ms. Hanoch testified that she had never seen Mr. León and Mr. Goodman "together" until December 16, 2022. Ms. Hanoch testified that Ms. Goodman told her that they "hooked up" over the summer. Ms. Hanoch testified that Ms. Goodman told her that Mr. León asked her to be a sex slave.   According to Ms. Hanoch, Mr. León also told to Ms. Goodman 'I can show you how to be a submissive.'  Ms. Hanoch said Ms. Goodman told her that she was scared of Mr. León because he had a lot of guns[58] and that he had begun to harass/bother her. Ms. Hanoch testified about text messages that occurred on October 11 and October 25, 2022. Ms. Hanoch told Ms. Goodman that she was not going to talk to Mr. León anymore due to his treatment of Ms. Goodman.[59]  Ms. Hanoch testified that after dinner they went to Woody's in separate Ubers.™  Mr. León hopped into Ms. Goodman's Uber.™  Ms. Hanoch didn't think that was a good idea.

Ms. Hanoch described Woody's as a large bar that had several floors, dancing, and different rooms. Ms. Hanoch described the group's activities while at Woody's. Ms. Hanoch stated that Ms. Goodman told her that Mr. León asked about whether she was wearing underwear. Ms. Hanoch testified that while on the dance floor, she physically inserted herself between Mr. Leon and Ms. Goodman. Ms. Hanoch also testified that

---

[57] Petitioner's Exhibit #7.
[58] Respondent's Exhibit #11 at 41.
[59] Petitioner's Exhibit #9.

during the evening Ms. Goodman told her that Mr. León had followed her into the bathroom and tried to get into her stall. Ms. Hanoch testified that Ms. Goodman told her that Mr. León had tried to grab her in the bathroom. Ms. Hanoch testified she lost Ms. Goodman again and that she was trying to track her down outside of Woody's. Ms. Hanoch testified that she tried to text and call Ms. Goodman. Ms. Hanoch testified she spoke to Ms. Goodman and Ms. Goodman said, "Edwin is following me." and "Help."[60] Ms. Hanoch testified about the texts that were received on December 16, 2022. Ms. Hanoch testified that she received texts as they were leaving Woody's. Ms. Hanoch said that during a phone call with Ms. Goodman, she told her someone was chasing her that she could hear Ms. Goodman screaming (at Mr. León), "Get away!" Ms. Goodman's voice was shaking. Ms. Hanoch began speed walking and then jogging towards City Hall.[61]   Ms. Hanoch testified that she told a Philadelphia police officer that her friend was being sexually assaulted. According to Ms. Hanoch, the officer just looked at her.

Ms. Hanoch testified that she sprinted toward Ms. Goodman and eventually caught up to Ms. Goodman. Ms. Hanoch saw that Mr. León's his arms were outstretched. Ms. Hanoch testified that when she saw Ms. Goodman, she was crying and her makeup had been streaking. Ms. Hanoch inserted herself between Mr. León and Ms. Goodman. Ms. Hanoch told Mr. León to "Get away from her," and "Don't ever touch her again, or I will kill you." According to Ms. Hanoch, Mr. León said "You don't know what I can do to you." and, "You don't know who I know." [62]   Ms. Hanoch said Ms.

---

[60] Petitioner's Exhibit #10; Respondent's Exhibit #4.
[61] Respondent's Exhibit #4.
[62] Respondent's Exhibit #4.

Goodman was having a panic attack and was gasping for air. Ms. Hanoch told Ms.

Goodman to put her head between her knees because she appeared to be

hyperventilating.   Mr. León told Ms. Hanoch that he should call the police on her. Ms.

Hanoch replied, "Don't worry, I already did."   Ms. Hanoch was referring to the police

officers[63] that she had already attempted to flag down. Ms. Hanoch testified that Ms.

Goodman was crying and trying to breathe in the 30-40 minute car ride back to

Wilmington.

Ms. Hanoch testified that she believed the relationship between Ms. Goodman

and Mr. León started out to be consensual. Ms. Hanoch said the relationship stopped

being consensual when Mr. León began to do things that Ms. Goodman did not want.

Ms. Goodman told her that Mr. León choked her to the point that she passed out. Ms.

Goodman also told Ms. Hanoch that Mr. León had tied her hands up so she could not

stop him from strangulation. Ms. Goodman told her that Mr. León hit Ms. Goodman

with a belt and that she told Mr. León she did not like that. Ms. Hanoch testified that

she asked Ms. Goodman about the relationship.[64]   Ms. Hanoch testified that she did not

report their interactions at YCST to human resources or the partners of YCST.[65]

Ms. Hanoch testified that the plan on December 16, 2022, was for her and Ms.

Goodman to Uber™ home. Ms. Hanoch testified that she did discuss with Mr. Powell

how Mr. León and Ms. Goodman kept disappearing with each other while at Woody's.

Ms. Hanoch testified that she did not know that Ms. Goodman had exchanged flirty

messages with Mr. León by Snapchat while they were at Woody's. She never saw Mr.

---

[63] Respondent's Exhibit #4.
[64] Respondent's Exhibit #4.
[65] *Id.*

León and Ms. Goodman kissing.  Ms. Hanoch testified that she left Woody's without Ms. Goodman.  Ms. Hanoch said that the text messages[66] that were forwarded to her by Ms. Goodman were altered without her knowledge.  Ms. Hanoch testified that she "blacked out" during part of her altercation with Mr. León in Philadelphia.  Ms. Hanoch said that she was just trying to punch and kick Mr. León in an attempt to get her away from Ms. Goodman.[67]   Ms. Hanoch said Ms. Goodman told her that she was afraid that she was going to be raped had she got into Mr. León's car in Philadelphia.  Ms. Hanoch testified she was not aware of any phone calls made by Ms. Goodman to Mr. León the night of December 17, 2022.  Ms. Hanoch also testified that Ms. Goodman didn't tell her that she was going to go over to Mr. León 's house on December 17th.  According to Ms. Hanoch, Ms. Goodman only told her that she was going to see her mother.

Ms. Hanoch testified that she had been good friends with Mr. León at YCST.  Ms. Hanoch testified that she did not go out on dates with Mr. León and that she did not have romantic feelings for him.  Ms. Hanoch said she had traveled with Mr. León.  Ms. Hanoch testified that Ms. Goodman told her that Mr. León was threatening to file a police report against her on December 17, 2022.  Ms. Hanoch testified that the police had never contacted her and that she only found out later that a private criminal complaint had been filed by Mr. León in Philadelphia.   Ms. Hanoch indicated that she was aware that the district attorney's office in Philadelphia had declined prosecution.  Ms. Hanoch testified that she became aware one week before the PFA trial that Mr.

---

[66] At one point, the Court reviewed a privilege log relating to text messages between Ms. Goodman and Ms. Hanoch. The privilege log was made a Court Exhibit.  The Court was satisfied after viewing the privilege log that the redacted material was not relevant to this PFA action.  Some of the redacted material related to personal conversations and YCST business (possible client information).
[67] Respondent's Exhibit #4.

León had tried to aggressively pursue a criminal complaint against her.  According to Ms. Hanoch, Ms. Goodman made her aware of Mr. León's demands that Ms. Goodman rectify the situation by text or affidavit.

Edwin León

Mr. Edwin León testified on May 24, 2023.  Mr. León testified that he and Ms. Goodman met in May of 2022 while he was a Law Clerk, and she was an Intern.  Mr. León testified an individual is a Law Clerk at YCST until they have passed the Delaware bar. An individual who fails twice may be asked you to leave the firm.  Mr. León testified that he did not pass the bar in 2022.   Mr. León said he decided to leave the firm in the fall of 2022.   Mr. León testified that he was fired from YCST in December of 2022.  His last day was December 31, 2022.

Mr. León testified that he did not assign work to Ms. Goodman, but they worked on some projects together.  Mr. León testified that he spoke to Ms. Goodman frequently that they would usually talk early in the morning.  Mr. León testified that they would communicate through text, Spotify™, Google Docs™, and Instagram.™  Mr. León testified that they had an argument over a Trendwatch[68] article that was due on September the 15th 2022.  Mr. León testified Ms. Goodman texted him and asked him to be more receptive to boundary setting.  Mr. León ignored this text.  Mr. León denied ever hazing Ms. Goodman at YCST.   Mr. León testified that there was no phone call at 6:00 AM on September 15th with Ms. Goodman.   Mr. León testified that there had been rumors about Ms. Hanoch at YCST and that he told Ms. Hanoch some unkind things

---

[68] Respondent's Exhibit #11 at 308.

that were being said about her. Mr. León indicated that a sexual harassment complaint had been filed in September of 2022 by Ms. Hanoch.

Mr. León testified he actually met Ms. Goodman in May 2022.  Mr. León said the dating relationship started off purely sexual.  Mr. León testified that their sexual relationship began in June of 2022.   According to Mr. León, she wanted to keep it private and so did he in the initial stages.   Mr. León said the relationship would run hot and cold.  Mr. León said she would text him that she wanted more in the relationship. Mr. León testified that in October/November of 2022 the relationship became odd. Mr. León indicated that they broke up in November 2022 but the breakup lasted less than 12 hours.  Mr. León testified that the couple had periods of time where they would make-up and then break-up.[69]  Mr. León testified that as of December 16, 2022, he considered Ms. Goodman to be his girlfriend.   Mr. León testified that he never asked her to move in with him.   Ms. Goodman had jealousy issues and that she threatened him to dream only about her and added a knife emoji.  Mr. León testified that he did not alter his text messages in any way, but that the text messages on July the 10th were altered.

Mr. León testified that they took the bar exam on Monday, Tuesday, and Wednesday in July of 2022.  He stayed in a hotel during the bar exam.   Ms. Goodman came to his room during the bar exam. Mr. León testified that he said, "Do you remember the first time that I whipped you?"   Mr. León testified that both he and Ms. Goodman found out that they had not passed the Delaware bar exam in October 2022. According to Mr. León, she was short and mean in her communications and that she

---

[69] Petitioner's Exhibit #9.

had somehow turned. Mr. León stated they both had disabilities and had pursued accommodations for the bar exam.

Mr. León testified that on October the 7, 2022, he sent a text indicating that he had dreamed about her skills and her sexual proclivity during oral sex. Mr. Leon stated that they had both regular sex and BDSM[70] sex their relationship. Mr. León testified that on the BDSM spectrum he's only interested in the bondage and dominance facets of the BDSM[71] spectrum. Mr. León testified that they talked about BDSM topics at length with Ms. Goodman.[72] Mr. León testified that they had 2 safe words and that they're safe words were yellow and red or tapping the other person 3 times. Mr. León testified that during sex that he had moved his hand toward her neck and that they had talked about him placing hands on her neck during sexual intercourse. Mr. León testified that they exchanged articles about BDSM[73] sex and that Mr. Goodman had sent him articles on this topic. Mr. León testified that she never used one of their safe words but that she had tapped him 3 times before. He had stopped when she tapped. Mr. León testified they talked about whipping and about her being a "good girl' in text messages. Mr. León testified that he would generally take his time and earn the trust of the person with whom he engaged in BDSM sex. Mr. León testified that when an individual (in the BDSM context) refers to "play time"[74] they are referring to a BDSM scene. Mr. León testified that when he mentioned the word "aftercare" he would be referring to an after-action report for a BDSM session. Mr. León testified that there were things that she

---

[70] Bondage/ Discipline Dominance/Submission Sadism/Masochism.
[71] Respondent's Exhibit #11 301.
[72] *Id.* at 218.
[73] *Id.* at 234.
[74] *Id.* at 288.

wanted that he did not want to pursue during their sexual liaisons.  Mr. León testified that Ms. Goodman wanted to engage in a level of strangulation that was longer or harder than his comfort level.  Mr. León also testified that Ms. Goodman wanted to explore touching him sexually in his anal area. Mr. León testified that he never strangled Ms. Goodman to unconsciousness.  Mr. León also testified that Ms. Goodman had a rape fantasy and that she wanted him to look at a Harry Potter themed book on December 11, 2022.[75]   Mr. León stated that he never asked her to send that book but that she wanted to do a lot of the things in the book.  Mr. León denied that he has a cage or any dog crates.  Mr. León testified that Ms. Goodman was uncomfortable with using a belt, but that they only used a belt one time. Mr. León testified that she was not comfortable with oral sex in general.  Mr. León stated that they left consensual marks on one another such as hickeys, bite, marks and marks from a whip or a crop.  Mr. León also testified that she threatened him with a knife emoji in November and October of 2022.  According to Mr. León, Ms. Goodman told him that if he ever cheated on her, 'I will cut it off.'  Mr. León also testified that he had become upset when Ms. Goodman indicated to him that 'I will have my dad kill you.'  According to Mr. Leon, Ms.  Goodman led him to believe that her father was a convicted criminal.  Mr. León stated that there was a criminal docket for Daniel Goodman (DOB 4/15/1975) for assault and simple assault.[76]  Mr. León testified that Ms. Goodman showed him a website with her father's arrest record on it.[77]

---

[75] Respondent's Exhibit #
[76] Respondent's Exhibit #10.
[77] Respondent's Exhibit #10.

Mr. León testified that on December 2, 2022, he had surgery. Mr. León testified they had sex before his surgery date.   Ms. Goodman was present during his recovery. Mr. León claimed that when he woke up, Ms. Goodman had a wand in her hand that his underwear was pulled down around his thighs.  According to Mr. León, Ms. Goodman said, "Relax, I'm just kidding."   Mr. León said there was a scratch on his behind/buttocks.  Mr. León also testified that Ms. Goodman often requested sex on a constant basis and that she would get angry or snippy when it was denied. Mr. León testified that from May 18th – December 2022, they had intercourse approximately 11 times.  Mr. León stated that she would also get angry and snap at him when he did not talk to her. Mr. León introduced in evidence phone logs from October to December 2022.  Mr. León indicated that he moved here as a teenager that he still has an accent. According to Mr. León, Ms. Goodman was embarrassed at his speech and said that he could not meet her family or friends until he learned how to speak correctly.  Mr. León testified that Ms. Goodman would make fun of him in regards to punctuation and she would get him grammar books.  Mr. León testified that Ms. Goodman would take things on our way out of his house and that she threw out some things that were from his ex-girlfriend.  Mr. León testified Ms. Goodman stole/misplaced one of his cellphones on December the 17, 2022.   Mr. León accused Ms. Goodman of stealing his prescription medication (Adderall and anxiety medication).   Mr. León also testified that Ms. Goodman took books and pieces of jewelry.   Mr. León said that when they got into arguments, Ms. Goodman would block his egress, or she would sleep outside his door (or downstairs) after arguments.   Mr. León also testified Ms. Goodman would wait in the driveway because she was so jealous and would not leave.  Mr. León said Ms.

Goodman threatened to distribute unwanted photographs of him picking apples because she thought that was 'so gay' and that she would not delete the pictures. Mr. León testified that Ms. Goodman would have fake medical episodes when she wanted him to come and get her. Mr. León testified that Ms. Goodman could have acute medical episodes and he would have to learn or do chest physical therapy for her cystic fibrosis. Mr. León testified that Ms. Goodman would make comments about him losing weight and would stalk him on social media. Mr. León testified that Ms. Goodman tried to reach out to his ex-girlfriends. Mr. León also testified that Nehama Hanoch was asking others to view his social media and that Ms. Hanoch asked him to go to a wedding.

December 16-17, 2022

Mr. León also testified there was a toy drive on or about December the 16th. Mr. León said it was a 45-minute drive and he packed clothes. Mr. León testified that the group went to a bar called the Devil 's Alley and that she was Snapchatting™ him. Mr. León testified that they had been too nervous to go out together and be seen and that it was going to be the first night that they went out together with others. Mr. León's testified the group had dinner at the Hark and Crown. Mr. León testified that Ms. Goodman lied in the group conversation and that they had a more emotional conversation in person. Mr. León testified that Ms. Goodman was secretly affectionate with him during the Uber™ ride. Mr. León testified that Ms. Goodman had at least 2.5 drinks by the time they got to Woody's. Mr. León also testified that Ms. Goodman had 6-7 drinks and that she had taken his Xanax™ when she was with him in the bathroom.

Mr. León testified they would wander off and meet up together.   Mr. León  said they would give each other secret signals and they ended up making out and kissing. According to Mr. León, there were text messages with Ms. Goodman that she was going to Delaware or Conshohocken.  Mr.  León said that she texted him, "I'm outside, I got kicked out."'   Mr. León stated that his responses were edited, and an emoticon was removed.  Mr. León testified Ms. Goodman altered the text message to remove romantic or emotional feelings toward him.  Mr. León believed that Ms. Goodman did this to hide her emotional connection with him from Nehama Hanoch.

Mr. León testified that they tried to call each other outside Woody's and that Ms. Gooodman was stumbling over the curb and that he eventually gave her this jacket. According to Mr. León, the bouncer had yelled at her. Mr. Leon testified that he knew the bouncer from the martial arts world and that Ms. Goodman confronted the bartender.  Mr. León stated that the bartender said she was wasted.  Mr. León indicated that he was joking around with the bouncer and that at some point Ms. Goodman got into an argument with the bouncer.  Mr. Leon testified they left together and went to look for food. Mr. León testified that they walked 3 blocks. Mr. León testified that she would walk ahead of him on the way back to the group so that the group would not know that they were together.   Mr. León testified that while they were outside of Woody's and Ms. Goodman saw a person with pink hair and went across the street to talk to that person. Mr. León testified that Ms. Goodman reached inside her boot took out a knife and motioned with a knife towards him to back off. Mr. León testified that Ms. Goodman clipped the knife to her skirt. Mr. León testified that he told Ms. Goodman, "I'm going back to Delaware."  Ms. Goodman suggested, "Let's just go to City Hall and we'll take

an Uber from there." [78]   According to Mr. León, Ms. Goodman wanted him to follow her. Mr. León testified that Hayden started to follow for about a half a block then he turned back.

Mr. León testified that he had a conversation with Ms. Goodman during their walk and that nothing happened.  Mr. León stated that Ms. Goodman seemed overall agitated.  Mr. León testified there was no reason for her to be agitated.  Mr. Leon said that when they got to City Hall that there was a back-and-forth because Ms. Goodman had gotten calls from Ms. Hanoch.  Mr. Leon testified that Ms. Goodman took some digs at him and that he had to lay down due to an anxiety attack. Mr. León testified that he told her to call 911 because he felt his heart was about to explode out of his chest.  Mr. León said he had his eyes closed and had to take deep breaths.  Mr. León testified that Ms. Goodman screamed his name and that he sprinted towards 15th street.  Mr. León testified that there was another guy next to her and he didn't know the situation. Mr. León testified that Ms. Goodman told him, "They're going to find out... they're going to find out," and, "They're gonna catch us."  Mr. León stated she then took off in a full sprint and that he was trying to calm Ms. Goodman.   Mr. León said Ms. Goodman was rambling and then she got down on the ground.   Mr. León said that Ms. Hanoch approached them and that she was clawing, screaming, and kicking. Ms. Hanoch went ballistic, and he got scratched on his face. [79]  Mr. León testified that he took a picture of the scratch on his face with his cell phone.[80] Mr. León testified that he had other injuries to his collarbone, chest, and cheek (inside).   Mr. León testified that once he was

---

[78] Respondent's Exhibit #14 (map from Mr. León).
[79] Respondent's Exhibit #15.
[80] Respondent's Exhibit #15.

attacked, he went to the police.  Mr. León told the police that he was assaulted by Ms. Hanoch and they took pictures.  Mr. León testified that Timothy Powell and Alexander Ferris confronted him and told him, "We know what you did."  Mr. León said he was cautioned, "You have no friends here," and that "No one will believe you."  Mr. León testified that Mr. Powell asked to see his phone.   Mr. León testified said Ms. Hanoch was not arrested that night, but he filed a police report that night.

Mr. León testified that he recorded telephone calls from Ms. Goodman the night of December 17, 2022.  Mr. León testified that he recorded the calls in Pennsylvania.  Mr. León testified that Ms. Goodman was blubbering to him on the phone that she didn't know what happened, and said, "I'm sorry," and "I will correct them."   Mr. León testified that she was panicking because she was scared, "They would find out about us." and "She was not panicking because you were chasing me."   Mr. León testified that he did not ask Ms. Goodman to sign or execute an affidavit.  Mr. León testified that he walked to his car and later drove home.  During his testimony, Mr. León questioned that if Ms. Goodman had a weapon, why didn't she brandish it?  Mr. León admitted to chasing Ms. Goodman during his testimony.  Mr. León testified that he did not assault her and did not grab her.  Mr. León said that his hands were in his pocket the entire time they were walking away from Woody's.

Mr. León testified that Ms. Goodman called him between 2:00 and 4:00 AM (around 16 calls).  He did not answer some of the phone calls.  Mr. León testified there were 9 calls during this time and 7 FaceTime(s).™  Mr. León testified that were text messages between 2:30 - 3:00 a.m.  Mr. León testified that the last phone call between them lasted around one hour, and that Ms. Goodman asked him to remain on the phone

until she fell asleep.  Mr. León testified that the battery died out on the phone.  Mr. León said that at some point during the night they were making out and he watched the earring fall from her ear.

Mr. León testified about his home surveillance video that was entered into evidence.   Mr. León stated that she was lying on the couch and that they were on the couch for 30 minutes.  Mr. León said was trying to console her and he was kissing her forehead.   Mr. León stated that Ms. Goodman was worried that she was going to lose her job.   Mr. León was observed giving Ms. Goodman chest PT by rubbing on her chest and her back.  Mr. León testified that he did not demand that Ms. Goodman to fix the situation or text any of his/her coworkers.  Mr. León testified that she showed up unhappy but that she left happy.  Mr. León said Ms. Goodman was supposed to come over again to his house on the December 18th.  Mr. León testified that the next morning she texted "Xanax is no joke" by Snapchat.

Mr. León testified that on December 29, 2022, he received a call from Ms. Goodman (recorded by the police).   Mr. León said it was a short call and Ms. Goodman indicated I can't talk now and there was an abrupt end to the phone call. Mr. León also testified that Ms. Goodman sent him a New Year's Eve message. Mr. León testified that he did not leave a message or letters on Google Docs.  Mr. León testified that he was blocked on social media by Ms. Goodman and that he continued to look at his social media because he believed there was attempt to assassinate his reputation.  Mr. León attempted to contact her family after it was clear she did not want contact.

Analysis

Mr. León made several claims that made the Court question his overall credibility. Mr. León added untrue and unnecessary derogatory comments[81] when narrating the video clips that he presented to the Court. Mr. León claimed that Ms. Goodman 's father made a threat that he was going to kill him. Mr. León testified that Ms. Goodman showed him a website that indicated that her father had been arrested for simple assault and aggravated menacing. In support of his claim, Mr. León introduced into evidence a copy of the docket for Ms. Goodman 's father. The date of the docket print-out was May 2023.[82] If Mr. León was so "scared" about this threat, why was his only copy of the docket 7-8 months from the date of the alleged threat? Ms. Goodman denied making this threat and indicated that she was only aware that her father had been arrested during his college years during a bar fight. In truth, it appears that Ms. Goodman 's father accrued these charges when Ms. Goodman was an infant (the case was closed 2/5/1998).[83] Furthermore, given the context of the text messages between the parties, it is clear that Ms. Goodman jokingly said, "my dad would kill you," when Mr. León said he was going to flirt with her mother and, "try to steal her away." [84] Mr. León would later reach out to Ms. Goodman's parents in late December 2022 after his relationship with Ms. Goodman was clearly over.[85]  The absurdity of the claim made by Mr. León is readily apparent.[86]

---

[81] Mr. León's editorial comments on Ms. Goodman's alleged stumbling and state of sobriety while seen on video were not credible.
[82] Respondent's Exhibit #10. The docket entry was printed on 5/23/23.
[83] Respondent's Exhibit #10.
[84] Respondent's Exhibit #11 at 317-318. The text exchange is from September 2022.
[85] Petitioner's Exhibit #11.
[86] The Court notes that Ms. Goodman's trial testimony regarding this interaction is corroborated by the text messages.

Mr. León's claim of a substantive dating relationship with Ms. Hanoch was also concerning.  Ms. Hanoch denied having such a relationship with Mr. León during her testimony.  Ms. Hanoch was incredulous on the witness stand when confronted with the possibility of a PFA filed against her by Mr. León.  Mr.  León filed his *pro se* PFA against Ms. Hanoch prior to her scheduled testimony in the PFA trial and several months after the events of December 16-17, 2022.  Mr. León provided no credible explanation for filing a PFA against Ms. Hanoch based on a "substantive dating relationship" during his testimony.   Mr. León testified that he believed that a subjective belief of a substantive dating relationship was all that was needed to file a Motion to Dismiss according to the Court 's comments on March 17, 2023.  Mr. León's PFA was also filed after *both* parties submitted legal filings about the definition of a "substantive dating relationship."   Mr. León's in person testimony regarding having a "substantive dating relationship" with Ms.

Hanoch was also utterly unbelievable.[87]   The PFA filed against Ms. Hanoch could be considered a frivolous filing.[88]

Finally, Mr. León's claim that he was sent a knife emoji as a "threat" from Ms. Goodman is frivolous and not supported by the weight of the evidence.  Mr. León's also offered sworn testimony as to this text emoji.  The Court reviewed over 450 pages of text between the parties.[89]  Ms. Goodman used a knife emoji twice.  The knife emojii was used in the context of what girls Mr. León should "dream about" before he went to sleep.  Ms. Goodman said, "have sweet dreams, or, in the alternative, dirty dreams about me (and only me [knife emoji])."[90]  This is not a death threat.  It is not a threat for serious bodily harm.  It was flirtatious banter with pure sarcasm.  Any reasonable

---

[87] **Rule 3.3. Candor Toward the Tribunal**

"(a) A lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence before a tribunal or in an ancillary proceeding conducted pursuant to a tribunal's adjudicative authority, such as a deposition, and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false. (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." *PA. ST. R.P.C.* Rule 3.3

[88] **Rule 3.1. Meritorious Claims and Contentions**

"A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established." *PA. ST. R.P.C.* Rule 3.1

[89] Respondent's Exhibit #11.
[90] Respondent's Exhibit #11 at 134.

person would understand it to be such.  Mr. León responded by text, **"I like that."** [emphasis added].  Ms. Goodman followed up with an emoji blowing a kiss.  Ms. Goodman used the knife emoji again in reference to "smutty dreams" about her or jokingly, another woman.[91]  Sworn testimony about the knife emoji being a threat is not credible.

The Court observed the demeanor of Ms. Goodman during her testimony.  Ms. Goodman appeared shaken but sincere while recounting the events of December 16-17, 2022.  Ms. Goodman blamed herself for not seeing the signs of trouble of her relationship with Mr. León.  Overall, Ms. Goodman's narrative of the events of December 16th and 17th were consistent with her PFA allegations and the testimony of the other witnesses. Ms. Goodman's overall testimony was certainly more consistent than that of Mr. León's. None of Ms. Goodman's claims were as fanciful as those made by Mr. León.  Ms. Goodman did not disclose her relationship to her coworkers at YSCT.  Ms. Goodman engaged in flirtatious behavior with Mr. León the night of December 16-17, 2022.  Ms. Goodman did not disclose to Ms. Hanoch that she had flirted with Mr. León and tried to hide that fact.  She most likely did not want to admit to Ms. Hanoch her flirtations with Mr. León, whom she had complained about.  The Court believed her explanation of not wanting to upset Mr. León during the night of December 16th and 17th by confronting him directly and telling him she wanted to go back to Wilmington.[92]  Nevertheless, drinking,

---

[91] Respondent's Exhibit #11 at 193.

[92] The Court also finds it improbable that Mr. Leon planned to go out of his way to drive Ms. Goodman back to Wilmington and then return (alone) to his residence in Conshohocken.  Mr. Leon was much closer to his residence when he was in Philadelphia.  Ms. Hanoch and Ms. Goodman were ostensibly headed in the same direction -- back to Wilmington to their shared apartment building.

engaging in flirtatious conversation, or having amorous activity with Mr. León at Woody's the night of December 16-17, did not excuse the abusive actions of Mr. León that followed.

### Mr. León engaged in a course of alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response:

The video evidence clearly shows Mr. León following Ms. Goodman as she walks away. Mr. León then sits and then slumps down. He grabs his chest. Ms. Goodman paced and kept her distance from Mr. León. Ms. Goodman raised her cellphone to her hear as to call 911 in reaction to Mr. Leon's actions. Mr. León testified that he asked her to dial 911 after his "anxiety attack." Ms. Goodman tried to get the attention of the police who were stationed across the street (she raised and waived her arm). As her back is turned and more people are present, Mr. León suddenly gets up. Mr. León sneaks away, out of frame. As Ms. Goodman begins to walk away and around the corner, Mr. León jogs to her - probably because he is lost sight of her around the corner.[93] As Mr. León gets closer, Ms. Goodman starts turns run away. Mr. León runs after her. Mr. León *chased* her. Mr. León faked illness in a disgusting effort to take advantage of Ms. Goodman's sympathy. It was nothing more than an ambush tactic. Mr. León miraculously recovered and his resumed his pursuit of her.

Ms. Goodman and Mr. Leon appear in the video a second time. Ms. Goodman can be seen backing away from Mr. Leon. Ms. Goodman runs away. Mr. León *chased her a second time.* The video evidence then shows Emily Jones, Hayden Shugg, and Nehama Hanoch running toward her last known location which was close to City Hall. It

---

[93] This is apparent when both videos (2 different vantage points/cameras) are reviewed.

appears her friends were frantically running after her and searching for her.  The video

shows Ms. Hanoch run across the street -- against traffic -- in an attempt to reach Ms.

Goodman as quickly as she could.  A bystander watched this in probable

fascination/concern.   Being chased, being concerned enough to dial 911 on the basis of

a false heart attack, are enough to place a reasonable person in emotional distress.  Ms.

Goodman's emotional distress was apparent that night, as multiple witnesses described

her condition after the chase.   The Court finds that Mr. León chased Ms. Goodman twice

and that his actions during both chases were in violation of 10 *Del. C.* §§ 1041 (1) (b), (d),

& (h).

> ### Mr. León intentionally or recklessly placed Ms. Goodman in reasonable apprehension of physical injury or sexual offense.

Mr. León engaged in sexual contact with Ms. Goodman in a coercive manner.  Mr.

León had threatened: (1) to file criminal charges against her friend in Pennsylvania;  (2)

to report her friend to the bar authorities in Delaware (presumably the Office of

Disciplinary Counsel); (3) to expose their relationship to coworkers, peers, and even her

mentor at work.  Mr. León pressured her to send out a group text/group e-mail.  Mr. León

pressured her to execute an affidavit.   After the sexual contact, Mr. León gave her a

deadline to accede to his demands to "make it right" before she left his residence.   Sexual

Extortion[94] is a Class E Felony as defined by the *Delaware Code.*  The Court refers to

---

[94] § 774. Sexual extortion; class E felony

"A person is guilty of sexual extortion when the person intentionally compels or induces another person to engage in
any sexual act involving contact, penetration or intercourse with the person or another or others, or to produce a
visual depiction of the person or another who is nude, or who is engaging in sexual conduct, with the person or
another or others by means of instilling in the victim a fear that, if such sexual act or production is not performed,
the defendant or another will:
(1) Cause physical injury to anyone;

this section of the *Delaware Code* as evidence of conduct that "a reasonable person under the circumstances would find threatening or harmful."[95]   According to his own testimony, Mr. León initially contacted the police that night in regards to her friend, but had to follow up with the Philadelphia Police Department.   Mr. León threatened further conduct that would have subjected her friend to criminal charges and/or bar disciplinary proceedings. Mr. León also threatened to sue Ms. Hanoch.     The actions threatened by Mr. León to coerce Ms. Goodman to have oral sex with him <u>do not have to be criminal</u> in nature to be considered coercive pursuant to 11 *Del. C.* § 774.  In total, Mr. León's threats would satisfy the elements of Sexual Extortion.[96]   The Court finds that Mr. León engaged in sexual activity with Ms. Goodman on December 17, 2022, and that a reasonable person would find this to be coercive.  Consequently, the Court finds that Mr. León engaged in oral sex with Ms. Goodman on December 17, 2022, and his actions were in violation of 10 *Del. C.* §§ 1041 (1) (b), (d), & (h).

<u>Additional Evidentiary Rulings</u>

The Court will not accept into evidence the audio recordings of conversations between Ms. Goodman and Mr. León made on December 17, 2022.  The recordings were

---

(2) Cause damage to property;
(3) Engage in other conduct constituting a crime;
(4) Accuse anyone of a crime or cause criminal charges to be instituted against anyone;
(5) Expose a secret or publicize an asserted fact, whether true or false, intending to subject anyone to hatred, contempt or ridicule;
(6) Falsely testify or provide information or withhold testimony or information with respect to another's legal claim or defense;
(7) Reproduce, distribute, exhibit, publish, transmit, or otherwise disseminate a visual depiction of any person who is nude, or who is engaging in sexual conduct; or
(8) Perform any other act which is calculated to harm another person materially with respect to the other person's health, safety, business, calling, career, financial condition, reputation or personal relationships.

Sexual extortion is a class E felony." 11 *Del. C.* § 774.

[95] 10 *Del. C.* § 1041.
[96] 11 *Del. C.* § 774.

made by Mr. León while he was in Pennsylvania and Ms. Goodman was in Delaware. Pennsylvania,[97] unlike Delaware, is a two-party consent state and Ms. Goodman did not consent to the audio recordings. The recordings were illegally made, and Ms. Goodman objected to their admission into evidence. The Court will defer to the law of the state where the recordings were made as in *T.L.D. v. K.J.D.* [98] and not consider the recordings to be admissible evidence.

The Court was informed that an audio computer file of a secretly taped conversation between Mr. León and his employer's general counsel was produced to Petitioner during discovery. The Court received written legal memorandum on the issue of whether the recording should be returned. The last pleading was filed on July 3, 2023, by Counsel for Mr. León. There is no indication that YCST consented to the disclosure of the recording to Petitioner, Ms. Goodman. There is no indication that YCST voluntarily provided the recording to Ms. Goodman. In general, the Court has a legal duty[99] to protect against the disclosure of attorney work-product or attorney-client material in litigation. The Court cannot say that it would be unreasonable for there to be potential litigation (employment or otherwise) given the events of December 2022 and the fact that both Ms. Goodman and Mr. León were employed by YSCT. The Court notes that it heard the sworn testimony of at least seven people who were present in Philadelphia the night of December 16-17, 2022, along with video surveillance. The Court finds that the tape of

---

[97] 18 *Pa. Cons.* § 5703. The Court also notes that the December 16-17, 2022, incident happened in Pennsylvania. Mr. León is a current resident of Pennsylvania and Ms. Goodman was also a resident of Pennsylvania for part of 2022. At least two Pennsylvanian law enforcement agencies were involved in this matter.

[98] In *T.L.D. v. K.J.D.*, 2013 WL 8330728 (Del. Fam. Ct. July 16, 2013), Family Court analyzed the admissibility of a clandestine recording based on the law of the state where the recording was performed. In *T.L.D.*, the recording was deemed inadmissible because it was made illegally. This approach follows *Restatement (Second) of Conflict of Laws* §152 (1971).

[99] "[T]he Court shall protect against the disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Fam. Ct. Civ. R.* 26 (g)(2).

Mr. Leon's conversation with his employer would be unnecessarily cumulative[100] and that the probative value of this conversation is not outweighed by the potential violation of privilege(s). The Court orders that Petitioner not disseminate and destroy the copy of Mr. León surreptitious recording of his conversation with General Counsel for YCST, Mr. Craig Grear.[101] The Motion to Compel is **DENIED**.

The Court viewed the alleged scratching by Ms. Goodman of Mr. León's arm in a video clip. All that was seen was Ms. Goodman trying to pull Mr. León's clothed arm in an attempt to get him to stop speaking to the Woody's bouncer/employee. There appeared to be no intentional physical injury inflicted at the time and Mr. León is seen smiling at the employee before he turns around and walks away with Ms. Goodman. The Court cannot determine that Ms. Goodman intentionally scratched Mr. León, if at all, in this video clip. Furthermore, it is rather dubious that Mr. León attributed this injury to Ms. Goodman when he was engaged in a more intense physical altercation with Ms. Hanoch later in the evening/morning of December 16-17, 2022.

The Court does not find that Mr. León injured Ms. Goodman's ear or ripped out her earring. Ms. Goodman did not establish by a preponderance of the evidence that Mr. León was responsible for any injury to her ear. Ms. Goodman herself did not know how the earing was dislodged from her ear. There is not enough circumstantial evidence in the record to attribute this injury to Mr. León.

---

[100] *D.R.E.* 403

[101] Mr. Grear was copied on a Motion to Compel filed by Counsel for Ms. Goodman. Mr. Grear sent unsolicited written correspondence to the Court during the PFA trial. The written correspondence was sent to both parties. The Court notes that YCST did not waive any attorney-client or work-product privileges based on Mr. León's recording. *D.R.E.* 502 (b).

The Court does find that Ms. Goodman sustained some type of injury to her arm on or about December 16-17, 2022.  There were no definitive pattern injuries (of a hand wrapped around an arm) present in the photos.  The injures also seemed to be in different stages of healing.  Despite these facts, the Court finds that Ms. Goodman's testimony credible that she sustained an arm injury while trying to evade/resist Mr. León in Center City Philadelphia on or about December 16-17, 2022.

Ms. Goodman did not prove by a preponderance of the evidence that Mr. León strangled her in a non-consensual manner in November of 2022.  Both parties testified that they engaged in sexual activity that involved consensual strangulation on several occasions. Mr. León would place his hands around Ms. Goodman's neck and Ms. Goodman would also place her hands on his hands as a measure of safety.  Mr. León testified that they developed "safe words" and a safety measure (tapping 3 times).  No contemporaneous photos of a neck injury to Ms. Goodman were offered into evidence and there was no indication that Ms. Goodman sought medical attention.   Both parties indicated that they had sexual intercourse in late November around Thanksgiving after this incident.

III.    **CONCLUSION**

Mr.   León committed acts of abuse pursuant to 10 *Del. C.* § 1041 (1) (b), (d), & (h).
Mr. León chased Ms. Goodman twice through Center City Philadelphia.  Ms. Goodman
contacted her friends for help.  Mr. León faked a heart attack and asked her to call 911.
Ms. Goodman repeatedly ran from Mr. León.  He resumed his chase afterwards.  Five
witnesses saw Ms. Goodman on the ground, head between her legs, shaken, and
struggling to breathe.  Her emotional distress was apparent.  The next day, Mr. León
coerced her into having oral sex with him after threatening to have criminal charges
filed against Ms. Hanoch, threatening to file a lawsuit against Ms. Hanoch, and
threatening to report Ms. Hanoch for professional discipline.  Mr. León also threatened
to damage Ms. Goodman's reputation by exposing their relationship to her coworkers.
Mr. León pressured her to execute an affidavit.  Mr. León pressured her to text her
coworkers to, "Make it right."  He gave her a deadline.  Ms. Goodman broke down
uncontrollably when asked if she had been raped that weekend in December 2022.  Mr.
León did not prove by a preponderance of the evidence that Ms. Goodman committed
an act of abuse.  Mr.  León's claims and sworn testimony were not credible in many
respects (as outlined above).  Mr. León's PFA petition is DENIED.  Ms. Goodman's
PFA petition is GRANTED.

8/31/23
**Date Written Order Issued**

**COMMSSIONER CRAIG R. FITZGERALD**

cc: Petitioner, Respondent, File

**Exhibit B**

IN THE FAMILY COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| CHEYENNE GOODMAN | ) |
| | ) File No.:  CN23-01005 |
| Petitioner, | ) |
| | ) Petition No.:  23-00029 |
| v. | )                      23-07261 |
| | ) |
| EDWIN LEÓN | ) |
| | ) |
| Respondent. | ) |

## COMMISSIONER'S ORDER ON REMAND
## PETITION FOR ORDER OF PROTECTION FROM ABUSE

Cheyenne Goodman., Pro Se
Kara Swasey, Esq., for Respondent

FITZGERALD, C.

On February 2, 2024, the Court conducted a hearing on remand in Family Court Petitions #  Present for the hearing were Cheyenne Goodman (Zoom) , Edwin León, Counsel for Mr. León, Kara Swasey, Esq., and several support persons for Mr. León. The Court heard testimony from Mr. León in regards to his audio recordings of the phone calls with Ms. Goodman.  The recordings were divided into 5 audio files and totaled approximately 64 minutes of phone conversation.

## First Four Phone Calls/Recordings

Mr. León did not inform Ms. Goodman that he recorded his phone calls with Ms. Goodman. Ms. Goodman initiates the phone calls.[1]  Mr. León placed these calls on speakerphone.  The only persons aware that the phone calls were being recorded were Mr. León and the persons on his end of the calls.  Mr. León can be heard using two different volumes on the recordings.  One volume is a lower tone of voice used for the person who is listening with him[2] to Ms. Goodman's call..   A second, louder tone of voice is used when he is talking to Ms. Goodman.[3]  Furthrmore, Mr. León takes guidance from the other voice on his end of the phone call.  The voice suggests areas of inquiry that he should pursue when he talks to Ms. Goodman.  Mr. León follows this advice throughout these recordings and attempts to elicit information from Ms. Goodman.

Ms. Goodman is in obvious **emotional distress**[4] during these phone calls.  Mr. Leon does inquire about Ms. Goodman's health during the calls and tries to calm her. Several times Ms. Goodman pleads with Mr. León to change the subject and to talk about something other than the events of that evening/morning.  Mr. León admits that he chased Ms. León during the panick attack.  Amazingly, Mr. León even acknowledged in a side conversation that Ms. Goodman could even die from a panic attack she was experiencing due to her medical condition – cystic fibrosis.

## Final Phone Call/Recording

The final recording appears to be a recording of a FaceTime™ session between the parties.  Ms. Goodman begins the final phone call in great distress.  Ms. Goodman struggles to communicate with Mr. León.  Mr. León  attempts to garner sympathy from Ms. Goodman about the damage done to his reputation and confrontation with Ms. Hanoch.  Mr. León falsely claimed to Ms. Goodman that he was arrested the night/morning of December 17, 2022.[5]  Mr. León tells Ms. Goodman that the police will be calling him at 11:00 a.m. and that he will have to pursue charges unless the situation is resolved to his satisfaction.  During this phone call, Ms. Goodman again asks Mr. León to change the subject.  At the end of the phone call, Ms. Goodman attempts to

---

[1] Mr. León testified that there were a number of calls on his phone log and that he picked up on the 4th phone call.
[2] Mr. León testified that the other voice was Evie Boland, an acquaintance (ex-girlfriend).
[3] Counsel for Mr. León suggested that Mr. León never 'yelled' at Ms. Goodman during the phone calls as impeachment.  The first four calls were on speakerphone on Mr. León's end and he used two volume levels.
[4] 10 *Del. C.* §1041 (1)(d).  Ms. Goodman struggled to breathe and can be heard crying.
[5] Mr. León also told Ms. Goodman that he, "lost consciousness."

placate Mr. Leon and agrees to, "fix it." Mr. Leon **demands** to know what words she will use to reframe the events of the previous night/early morning.

## CONCLUSION

The Court concludes that the phone recordings were not exculpatory as to Mr. León. Mr. León admits to chasing Ms. Goodman during the phone calls. Ms. Goodman says, "You chased me," to Mr. León numerous times during their phone conversations. Ms. Goodman repeatedly stated that the pursuit was non-consensual and that Mr. León could have refrained from chasing her and remained at a distance. During the phone calls, it was painfully obvious that Ms. Goodman was having a panic attack. Mr. León also tried to redirect[6] Ms. Goodman from her recollections of the events, especially when she used the word, "chasing." The Court finds this to be an obvious attempt to get Ms. Goodman to describe the events in a light more favorable to Mr. León,[7] as opposed to simply letting her describe what happened. In addition, Mr. León can be heard during the phone recordings trying to get Ms. Goodman to divulge anything she knows about the motivations of Ms. Hanoch that evening. Ms. Goodman does not know she is being recorded. She does not appear to have an agenda. She does not take her cues from an undisclosed observer. The same cannot be said of Mr. León. Nothing in the recorded calls establishes any act of abuse perpetrated by Ms. Goodman against Mr. León as alleged in his cross PFA petition. The phone calls reinforce the notion that Mr. León engaged in a **non-consensual chase** of Ms. Goodman and caused her to have a panic attack(s).[8]

3/5/24
**Date Written Order Issued**

cc: Petitioner, Respondent, File

**COMMSSIONER CRAIG R. FITZGERALD**

---

[6] Counsel for Mr. León suggested that Mr. León never 'berated' Ms. Goodman during the phone calls as impeachment. Mr. León never accepted Ms. Goodman's word choices during the phone call and chastised her. The final phone call contains several examples of Mr. León scolding/ condemning Ms. Goodman's repeated use of the phrases, "You chased me," or "You were chasing me."
[7] During the phone call, Mr. León excuses his actions due to the fact that Ms. Goodman was "drunk" in Center City Philadelphia.
[8] The recordings are indicative that Ms. Goodman had a panic attack in Philadelphia (1) and then again on the phone calls while talking to Mr. León (2).

**Exhibit C**

Form 486    P E R S O N A L   S E R V I C E    (OFFL ADDR)

**STATE OF DELAWARE FAMILY COURT: NEW CASTLE COUNTY**
**500 N. KING ST., WILMINGTON, DE 19801-3742**
**CIVIL SUMMONS**
**PETITION FOR ORDER OF PROTECTION FROM ABUSE**

LEON, EDWIN                                          FILE: CN23-01005
                                                     CASE: 23-07261

PETITIONER(S)                        ATTORNEY(S)

   VS.
   GOODMAN, CHEYENNE

RESPONDENT(S)                        ATTORNEY(S)

TO: CHEYENNE GOODMAN
    101 W 10TH STREET
    WILMINGTON DE 19801

--------------------------------------------------------------------------

TO PROCESS SERVER:    You are commanded to summons the above named respondent
                      by serving a copy of this summons and and ANY ATTACHED
                      PETITION, NOTICE and/or ORDER.

**ATTENTION: RESPONDENT**

   You have been named as a Respondent in a Protection from Abuse (PFA)
   Petition in the Family Court. The Petitioner alleges the Respondent has
   committed acts of abuse against themselves or their minor child. Please
   read the following statements and any attached documents carefully.

1. Family Court Civil Rule 12 (a) states that you do not need to file
   an Answer to the Petition.

2. If a notice to appear for a scheduled proceeding is NOT attached, you
   will receive a WRITTEN NOTICE LATER advising you of the date and time
   of your Court proceeding.

3. You must report any change of address to the Court as soon as possible
   and provide a valid telephone number and email address where you can
   be reached. You can do this one of two ways:
        Online at https://courts.delaware.gov/family/remotehearing, OR
        Call 302-255-0300, option 6.

4. Failure to report a change of address, or to appear when scheduled,
   may result in a decision being made against you.

**WITNESS THE JUDGES OF THE FAMILY COURT OF THE STATE OF DELAWARE, THIS DATE**

                    04/13/2023                REGINALD EASTON
                    Date Issued               Clerk of Court

For more information go to the Family Court Website:
http://courts.delaware.gov/family
                                              CFCREAS   04/13/2023

```
Form 496                          (OFFL ADDR)
```

### STATE OF DELAWARE FAMILY COURT: NEW CASTLE COUNTY
#### 500 N. KING ST., WILMINGTON, DE 19801-3742
#### CIVIL NOTICE
### PETITION FOR ORDER OF PROTECTION FROM ABUSE

LEON, EDWIN                                          FILE: CN23-01005
                                                     CASE: 23-07261

PETITIONER(S)                        ATTORNEY(S)

vs.

GOODMAN, CHEYENNE

RESPONDENT(S)                        ATTORNEY(S)

TO: CHEYENNE GOODMAN
    101 W 10TH STREET
    WILMINGTON DE 19801

----------------------------------------------------------------------
    Date / Time   :    04/26/2023  at   9:00AM
    Event Type    :    Hearing in the Family Court
    Location      :    Floor:   Courtroom:
    Before        :    COMMISSIONER  CRAIG FITZGERALD
    This hearing has been allotted  5 hours and 30 minutes.
----------------------------------------------------------------------

**Please Arrive at the courthouse 15 Minutes BEFORE Your Scheduled Hearing**

**You are directed to appear before the Family Court at the above address on the above noted date and time in connection with the matters set forth above for a hearing.**

**Please consider this notice that should you fail to appear for this proceeding, pursuant to Rule 55 of the Family Court Rules of Civil Procedure, a final (default) order may be entered against you for the relief demanded in the Petition. Additionally, if you are the petitioner and you fail to appear, your petition may be dismissed.**

If there are witnesses who will not appear voluntarily on your behalf, contact the Clerk of the Court to obtain information on subpoena procedures and fees.

The Court does not have facilities for children. Unless the children will be testifying as witnesses, please make arrangements for their care while you are at the courthouse.

If you are scheduled for a hearing on a Minor Name Change, please be sure to bring any child of this action who is 6 years or older to the hearing.

To request remote participation in your hearing, you must complete Form 584 - Request to Participate Remotely. Absent extenuating circumstances, this form must be filed fourteen (14) calendar days prior to your scheduled hearing. The form can be found on the Family Court website at: https://courts.delaware.gov/family/.

If you have evidence you would like to present to the Court, bring it with

PAGE        2

PETITIONER(S)          EDWIN LEON

RESPONDENT(S)          CHEYENNE GOODMAN

you to your hearing. If you have been granted a remote hearing, see the
Submitting Evidence for your Virtual Hearing to Delaware Family Court
guide at: https://courts.delaware.gov/help/proceedings/FC_CourtHearing.

BRING THIS NOTICE WITH YOU AND DRESS APPROPRIATELY. Your clothing and
conduct should be consistent with the seriousness and dignity of the
judicial process.

CELLULAR TELEPHONES and other personal communication devices as well as
photographic and voice recording equipment are PROHIBITED in the courthouse
in New Castle County.

MASKS ARE OPTIONAL IN THE COURTHOUSE. In order to maintain appropriate
social distancing throughout the courthouse, please do not bring extra
people to your hearing with you unless they are a participant in the case
or a support person.

   **WITNESS THE JUDGES of the Family Court of the State of Delaware,**

                    04/13/2023        REGINALD EASTON
                    Date Issued       Clerk of Court


                                      CFCDKEA   04/13/2023

Form 486     P E R S O N A L   S E R V I C E     (OFFL ADDR)

### STATE OF DELAWARE FAMILY COURT: NEW CASTLE COUNTY
#### 500 N. KING ST., WILMINGTON, DE 19801-3742
#### CIVIL SUMMONS
#### PETITION FOR ORDER OF PROTECTION FROM ABUSE

LEON, EDWIN                                    FILE: CN23-01005
                                               CASE: 23-07261

PETITIONER(S)                     ATTORNEY(S)

VS.
GOODMAN, CHEYENNE

RESPONDENT(S)                     ATTORNEY(S)

TO: CHEYENNE GOODMAN
    101 W 10TH STREET
    WILMINGTON DE 19801

---------------------------------------------------------------------

TO PROCESS SERVER:   You are commanded to summons the above named respondent
                     by serving a copy of this summons and and ANY ATTACHED
                     PETITION, NOTICE and/or ORDER.

**ATTENTION: RESPONDENT**

You have been named as a Respondent in a Protection from Abuse (PFA)
Petition in the Family Court. The Petitioner alleges the Respondent has
committed acts of abuse against themselves or their minor child. Please
read the following statements and any attached documents carefully.

1. Family Court Civil Rule 12 (a) states that you do not need to file
   an Answer to the Petition.

2. If a notice to appear for a scheduled proceeding is NOT attached, you
   will receive a WRITTEN NOTICE LATER advising you of the date and time
   of your Court proceeding.

3. You must report any change of address to the Court as soon as possible
   and provide a valid telephone number and email address where you can
   be reached. You can do this one of two ways:
       Online at https://courts.delaware.gov/family/remotehearing, OR
       Call 302-255-0300, option 6.

4. Failure to report a change of address, or to appear when scheduled,
   may result in a decision being made against you.

**WITNESS THE JUDGES OF THE FAMILY COURT OF THE STATE OF DELAWARE, THIS DATE**

                  04/13/2023              REGINALD EASTON
                  Date Issued             Clerk of Court

**For more information go to the Family Court Website:**
**http://courts.delaware.gov/family**

                                       CFCREAS   04/13/2023

Form 450
Rev 8/22

**VINE** (Register to receive custody status updates and criminal case information): 877-338-8463 or vinelink.com

**Attorney General's Office Victim/Witness Assistance:** 800-870-1790

**VCAP** (Victims' Compensation Assistance Program): (302) 255-1770

**DE Victim Center:**  1-800-VICTIM-1 (1-800-842-8461)

**VIP** (Violence Intervention Program/Capitol Police.  For accompaniment by a police officer to in-person court proceedings): Complete the online referral form by visiting http://capitolpd.delaware.gov (click on the VIP icon).

**\*Please keep this sheet for your records. You do not need to file this page with the petition.\***

# The Family Court of the State of Delaware
### In and For  New Castle County   Kent County   Sussex County

## PETITION FOR ORDER OF PROTECTION FROM ABUSE

*Petitioner*                                    *v. Respondent*

| Name | Name | File Number |
|---|---|---|
| Edwin Leon | Cheyenne Goodman | |

| Telephone Number | Date of Birth | Telephone Number | Date of Birth |
|---|---|---|---|
| 484-866-3399 | 06/21/90 | 215-688-0158 | 03/06/97 |

| Street Address *(DO NOT LIST ADDRESS IF BELOW YOU ARE REQUESTING A CONFIDENTIAL ADDRESS)* | Street Address (including Apt) |
|---|---|
| | 101 W. 10th Street (Apt. 1213) |

Potition Number

| P.O. Box Number | P.O. Box Number |
|---|---|
| | |

| City/State/Zip Code | City/State/Zip Code |
|---|---|
| | Wilmington DE |

| Email Address | Email Address |
|---|---|
| edwin.leon21@yahoo.com | cgoodman@ycst.com |

| Attorney Name | Attorney Name |
|---|---|
| | |

| Interpreter Needed  Yes  No | Interpreter Needed  Yes  No |
|---|---|
| Language: | Language: |

**Para asistencia en español llame a: (302) 762-6110 (New Castle County)
o (302) 745-9874 (Kent y Sussex Counties).**

2 of 9

Form 450
Rev 8/22

| Child(ren) | Date of Birth | Is this the respondent's child? | | Are you alleging the respondent abused this child and you want the child to be a petitioner? | |
|---|---|---|---|---|---|
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |
| | | Yes | No | Yes | No |

The Petitioner respectfully requests that this Court issue an Order of Protection from Abuse against the Respondent, as provided for in 10 *Del. C.*, § 1041 *et seq.* In support of this request, the Petitioner states that:

1.  I ask that the following addresses be **kept confidential because** the disclosure of this information will place me and/or my child(ren) in danger:

> X  the address of my place of residence, school and/or employment
>
> X  the address of my child(ren)'s residence, school or child care

> **\*\*\* DO NOT LIST ADDRESS ON PETITION IF REQUESTING A CONFIDENTIAL ADDRESS \*\*\***

2. Choose one:

Petitioner's relationship to Respondent is: (select relationship)

> Current or former spouse                     Living together
>
> (X)  Current or former substantive dating relationship     Child in common
>
> Family member (specify relationship): _____
>
> Custodian of Children

**OR**

Affidavit of Parentage attached and incorporated herein.

**OR**

Petitioner is the Division of Family Services acting in the interest of a minor child.

**OR**

Petitioner is the Division of Adult Protective Services acting in the interest of an infirm adult.

3. The Respondent has committed the following act(s) of abuse against the Petitioner and/or the Child(ren). Make sure each act(s) specify whether it happened to the Petitioner or to the Child(ren). You may not be allowed to testify about acts not adequately described. (*Please describe all the acts of abuse you wish the Court to consider, including dates if known. If additional space is required please attach the Court Addendum Form, Form 540.)* Abuse is defined by Delaware law (10 Del. C. § 1041) as:

> a.   Causing or attempting to cause physical injury or sexual offense. (Describe below.)

Form 450
Rev 8/22

Respondent constantly carried a knife and would make threats as to what Respondent could do with the knife Respondents dad gifted Respondent. Respondent has struck me in the face and threatened to have her father Dan Goodman, who has a criminal record to "shoot me" with his guns or take his guns and use them. The Respondent has attempted to force me to engage in unwanted sexual acts. Respondent has a Harry Potter rape fantasy that I refuse to engage in and it would make the respondent angry to the point where respondent would push or strike me. The respondent would then refuse to speak in an attempt to coerce me, that if I did not do it Respondent would "leave me" or "get me into trouble".

Respondent also had her friend assault me in public and permanently scar my face. I reported this incident to the police but respondent threatened against this.

b.  Placing or attempting to place me (Petitioner) or child(ren) in reasonable fear of physical injury or sexual offense. (Describe below.)

The Respondent made many threats with a knife and Respondent's father's weapons. Respondent would force me to call many times a day and if I refused threaten to leave me, sleep with someone else, or professionally harm me. Respondent smacked and scratched me in unwanted ways on many occasions. Respondent also said "my dad will kill you" referring to Dan Goodman, who has a criminal history of violence acting on respondent's behalf.

c.  Damaging, taking, or destroying my (Petitioner) or child(ren)'s property. (Describe below.)

Respondent would take items from my home after searching without permission. Respondent would then take unwanted pictures of me and threaten to use them at work or with my friends. I on many occasions had to argue for respondent to delete them. Respondent would also take gifts back without notifying me and refuse to return them.

d.  Engaging in alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response. (Describe below.)

After attempting to end the relationship with Respondent on many occasion and refusing certain sexual acts I told the respondent I felt sexually coerced. Respondent then sent me article and said I was "stupid" and didn't know what coercion meant. That if I wanted to know I should learn to read and I could start with the articles Respondent sent me. Respondent insulted my level of reading comprehension as I am an English as a Second Language speaker. Respondent bought me grammar books and told me "You should learn to speak properly if you want to meet my family."

e.  Trespassing on my (Petitioner) or child(ren)'s property. (Describe below.)

Form 450
Rev 8/22

On more than one occasion I asked Respondent to leave my home. Respondent refused and said I would have to physically remove Respondent. I was on a few occasions able to talk respondent out the door and push the door closed, on others I had to lock myself in my bedroom and respondent would sleep on the couch against my wishes. On one occasion I told respondent I would call the police if respondent did not leave.  Respondent then stood in the doorway which I had to push closed to get away from the respondent. (See attached)

f.   Child abuse (Describe below.)

g.   Unlawful imprisonment, kidnapping, and interference with custody and coercion. (Describe below.)

As described (e) I would have to lock myself in my bedroom until Respondent decided to leave my home.  This was at times over 8 hours. Respondent would then say if I hugged the respondent the respondent would then leave.  This only worked some of the time and other times would end in me being yelled at.

h.   Any other conduct which a reasonable person would find threatening or harmful. (Describe below.)

Respondent would often pretend to cry and fake medical episodes in order to get me to capitulate to respondents demands. At times it was over the phone and Respondent wanted me to say or do something for the respondent such as tell respondents co-workers lies or rumors. Respondent would switch tone of voice to a baby voice if intimidation did not work.

Respondent would tell me one thing and tell her co-workers and friends a different story as to the status of our relationship if I did not do what Respondent wanted. Respondent would claim I was sexually harassing respondent, tell others falsities of my sexual preferences, or would make nasty comments about my weight or appearance.

On more than one occasion respondent threatened to tell people that I was "gay" or liked things in my "anus" in an attempt to embarrass me over sexual preferences.

Respondent also maintained that she had video or pictures of "gay acts" and would expose them to others if I did not meet her demands.

Respondent would drive by my home or wait in my driveway unwanted and unannounced.

4. Petitioner has reason to believe that the Respondent is in possession of the following firearm(s):

| Describe Each Firearm | Provide Location of Each Firearm |
|---|---|
| | |

Form 450
Rev 8/22

| Pistol | 830 Fulton Ave, Lansdale PA |
|---|---|
|  |  |
|  |  |
|  |  |

**WHEREFORE**, Petitioner asks this Court for the following relief(s):

Prohibit the Respondent from committing any act of abuse against the Petitioner (or his or her minor children).

Order the Respondent to stay away from:

      X Petitioner

      X Petitioner's home

      X Petitioner's workplace

  X    Other:    Petitioner's family's home.

Prohibit the Respondent from contacting or attempting to contact the Petitioner in any way, including, but not limited to, by phone, by the mail or by any other means.

A PFA Order typically lasts for 1-2 years. If you would like the order to last longer than 1 year, fill out the aggravating factors below to grant no contact relief for as long as reasonably necessary to prevent further acts of Domestic Violence up to and including a permanent order of Court pursuant to 10 *Del C.* §1045(f). **(Please use the space provided to date and detail these events)**

1.    Actions resulting in physical injury or serious physical injury to me (Petitioner)

    caused by the Respondent. *(Describe below.)*

    Respondent struck me in the face (see video) and left scratches all over my body during unwanted acts of sex. Respondent also left bite marks on my chest and shoulder (see picture). Respondent also attempted to penetrate me with what she described as a wand on 12/2/23 I was recovering from a medical procedure and drugged.  I later confided in a friend about the incident.  Respondent said wand was made of "hawthorn wood and dragon heartstring core" and was related to Respondent's favorite Harry Potter fanfiction book. Petitioner feared repercussions verbally, physically, emotionally, and professionally as Respondent threatened to tell coworkers that Petitioner enjoyed some of these sexual acts and would only believe the Respondents story. Respondent would take advantage of me when I was medicated and do sexual things that I did not ask for or consent to.

    Respondent has claimed to have images to use against me if I ever step out of line."

2.    The use of a deadly weapon or dangerous instrument against me (Petitioner)

    by Respondent. *(Describe below.)*

    Respondent threatened me with a knife.

Form 450
Rev 8/22

_____

_____

_____

3.  A history of repeated violations of prior protective orders by the Respondent. *(Describe below.)*

I believe the Respondent has had PFA's in the past and has still attempted to contact the person. Respondent said "I ruined all of their lives" when speaking about other instances of domestic abuse.

_____

_____

4.  Prior convictions for crimes against me (Petitioner) by the Respondent. *(Describe below.)*

_____

_____

_____

5.  Exposure of any member of the my (Petitioner's) family or household to physical injury by the Respondent. *(Describe below.)*

_____

_____

_____

Any other acts of abuse towards me (Petitioner) which the court believes constitute an immediate and ongoing danger *(Describe below.)*

6.

I reported Respondent and her friend to the police and in retaliation Respondent attempts to have charges brought against me. The police have decided not to charge and the Respondent then got a PFA.   I believe the PFA will be dismissed in just two weeks but fear what will happen when it does. I want the respondent to stay away and no longer harm me physically, verbally, emotionally, or professionally.

_____

_____

Order that the Petitioner be given the exclusive use and possession of the parties' residence at:

_____

_____

Order the Respondent to pay $ _____ to the Petitioner as compensation for losses

Form 450
Rev 8/22

Suffered as a direct result of the domestic violence.

Award temporary custody and/or residency of the parties' minor child(ren) to the Petitioner (please specify names and date of birth of the child(ren)).  **YOU MUST INCLUDE FORM 346 – CUSTODY SEPARATE STATEMENT IF THIS BOX IS CHECKED:**

_____   _____

_____   _____

Order the Respondent to pay temporary support for the child(ren).

Order the Respondent to pay $ _____ support for the Petitioner.

Order the Respondent to pay or reimburse fees and costs.

Award the Petitioner temporary possession of the following personal property (including but not limited to motor vehicles, checkbooks, keys and other personal effects listed below):

_____

Order the Respondent to be evaluated by a certified domestic violence treatment agency and follow all recommendations for treatment and counseling.

Other: _____

_____

_____

The Petitioner also asks the Court for any other such relief that the Court deems appropriate and just.

_04/12/23_____
Date

_____
Petitioner/Petitioner's Attorney

Form 450
Rev 8/22

## VERIFICATION

STATE OF DELAWARE          )

                           )  ss.:

COUNTY OF    New Castle     )

_____ Edwin Leon _____ , being duly sworn, says:

I am the Petitioner in this action.  I have read the above Petition and know to the best of my knowledge that the

Facts contained therein are true.

_____
                                        Petitioner

Subscribed and sworn before me on this date,

_____          _____
          Date                              Clerk of Court/Notary Public

Form 677
Rev 8/21

# The Family Court of the State of Delaware

In and For ☒ New Castle County ☐ Kent County ☐ Sussex County

## UNSWORN DECLARATION

DIRECTION TO THE FILING PARTY: Attach this form with any filings that are submitted without being notarized.

As of July 1, 2020, and pursuant to Section 3927 of Title 10, Family Court Standing Order #3, and Rule 79.2 of the Family Court Rules of Civil Procedure, except as noted below, as related to pleadings and papers filed in Family Court, Unsworn Declarations may be used in lieu of verifications, sworn declarations, affidavits, and notarized signatures.   An Unsworn Declaration **may not** be used with:

(a) Parental Consents to any of the following: Termination of Parental Rights, Permanent Guardianship, or Guardianship,

(b) Consent Parentage Decrees, or

(c) Consents filed in an Adoption Proceeding.

### Unsworn Declaration Made Under Penalty of Perjury

Pursuant to Section 3927 of Title 10 of the Delaware Code, Family Court Standing Order #3, and Rule 79.2 of the Family Court Rules of Civil Procedure, I declare under penalty of perjury under the laws of Delaware that the allegations contained in the below listed documents are true and correct.

Executed on the _____12_____ day of _____April_____ , ____2023____ .

_____Edwin Leon_____
Printed Name

_____/s/ Edwin Leon_____
Signature
(Electronic signature is permitted -- sign as "/s/Your Name")

### List all Court Forms and Documents that accompany this Unsworn Declaration:

| 240 |
| --- |
| 654 |
| 450 |
| |
| |
| |
| |
| |
| |

1:35

  

CG

Chey

Sat, Dec 24, 2:06 AM

I know i shouldn't be stalking because it does nothing for my peace of mind but i AM because i cant sleep and I was hoping it'd give me a glimpse into where we are on the crazy scale... i obsessively use pinterest which he knows because i showed him how to use it over the summer and i just looked at his profile a few days ago to block him, since then he's added a whole boars of poems from MY favorite poet (the one i showed you the print from in the elevator) i feel so fucking insulted that he genuinely thinks i'm that easy to manipulate

he made the stupid board 7 hours ago

Sat, Dec 24, 10:32 AM

Girl I hope you slept in

What did he think? You'd see that and immediately decide to call him or something?? That is insulting, I agree



girl i was getting SO close to calling to make sure u wete alive lol

  Message 

       



Messages - Chey Goodman

Ayou okay?

?

> ??

> Hello?

12/14/22, 8:02 AM

sorry my mom called lol

> All good. I'm going to take bug for a walk on a few. Want me to wait or call you back when I'm back?

I'll call!!

> Wait when lol

> Like after the walk

> I'll just text when I'm back

12/14/22, 9:35 AM

> Hi?

12/14/22, 5:20 PM

> Don't leave

I'll be here til like 6:15

why

12/15/22, 4:59 PM

Who is Alexis again

> Who?

12/15/22, 10:21 PM

?

12/16/22, 8:59 AM

https://www.abc.net.au/everyday/should-you-ever-have-sex-when-you-dont-feel-like-it/12484234

Messages - Chey Goodman

12/11/22, 6:50 PM

I'm feeling very self conscious about my pins now

Are you deleting some?

no haha i meant because i just pinned a bunch of stuff

harry potter themed stuff

as if u needed another reason to call me a nerd

One of the best things about you

ah yes, my endless harry potter knowledge

Also she didn't answer

if i send u a fanfic will u read it or is that too much lol

she sucks

I would after next week

Also, the wedding is a hard no ... No matter what, right?

what do you mean

okay, i'm going to email you some

Just if I could convince you

are you stalking my wedding board

12/11/22, 10:00 PM

edwin

Yes

you didnt open my snap

I was getting ready for bed/shower

Oh

Form 450
Rev 8/22

Respondent constantly carried a knife and would make threats as to what Respondent could do with the knife Respondents dad gifted Respondent.  Respondent has struck me in the face and threatened to have her father Dan Goodman, who has a criminal record to "shoot me" with his guns or take his guns and use them. The Respondent has attempted to force me to engage in unwanted sexual acts.  Respondent has a Harry Potter rape fantasy that I refuse to engage in and it would make the respondent angry to the point where respondent would push or strike me.  The respondent would then refuse to speak in an attempt to coerce me, that if I did not do it Respondent would "leave me" or "get me into trouble".

Respondent also had her friend assault me in public and permanently scar my face. I reported this incident to the police but respondent threatened against this.

b.   Placing or attempting to place me (Petitioner) or child(ren) in reasonable fear of physical injury or sexual offense. (Describe below.)

The Respondent made many threats with a knife and Respondent's father's weapons. Respondent would force me to call many times a day and if I refused threaten to leave me, sleep with someone else, or professionally harm me.  Respondent smacked and scratched me in unwanted ways on many occasions.  Respondent also said "my dad will kill you" referring to Dan Goodman, who has a criminal history of violence acting on respondent's behalf.

c.   Damaging, taking, or destroying my (Petitioner) or child(ren)'s property. (Describe below.)

Respondent would take items from my home after searching without permission. Respondent would then take unwanted pictures of me and threaten to use them at work or with my friends.  I on many occasions had to argue for respondent to delete them. Respondent would also take gifts back without notifying me and refuse to return them.

d.   Engaging in alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response. (Describe below.)

After attempting to end the relationship with Respondent on many occasion and refusing certain sexual acts I told the respondent I felt sexually coerced.  Respondent then sent me article and said I was "stupid" and didn't know what coercion meant.  That if I wanted to know I should learn to read and I could start with the articles Respondent sent me. Respondent insulted my level of reading comprehension as I am an English as a Second Language speaker. Respondent bought me grammar books and told me "You should learn to speak properly if you want to meet my family."

e.   Trespassing on my (Petitioner) or child(ren)'s property. (Describe below.)

Form 450
Rev 8/22

On more than one occasion I asked Respondent to leave my home. Respondent refused and said I would have to physically remove Respondent. I was on a few occasions able to talk respondent out the door and push the door closed, on others I had to lock myself in my bedroom and respondent would sleep on the couch against my wishes. On one occasion I told respondent I would call the police if respondent did not leave. Respondent then stood in the doorway which I had to push closed to get away from the respondent. (See attached)

f.    Child abuse (Describe below.)

g.    Unlawful imprisonment, kidnapping, and interference with custody and coercion. (Describe below.)

As described (e) I would have to lock myself in my bedroom until Respondent decided to leave my home. This was at times over 8 hours. Respondent would then say if I hugged the respondent the respondent would then leave. This only worked some of the time and other times would end in me being yelled at.

h.    Any other conduct which a reasonable person would find threatening or harmful. (Describe below.)

Respondent would often pretend to cry and fake medical episodes in order to get me to capitulate to respondents demands. At times it was over the phone and Respondent wanted me to say or do something for the respondent such as tell respondents co-workers lies or rumors. Respondent would switch tone of voice to a baby voice if intimidation did not work.

Respondent would tell me one thing and tell her co-workers and friends a different story as to the status of our relationship if I did not do what Respondent wanted. Respondent would claim I was sexually harassing respondent, tell others falsities of my sexual preferences, or would make nasty comments about my weight or appearance.

On more than one occasion respondent threatened to tell people that I was "gay" or liked things in my "anus" in an attempt to embarrass me over sexual preferences.

Respondent also maintained that she had video or pictures of "gay acts" and would expose them to others if I did not meet her demands.

Respondent would drive by my home or wait in my driveway unwanted and unannounced.

4. Petitioner has reason to believe that the Respondent is in possession of the following firearm(s):

| Describe Each Firearm | Provide Location of Each Firearm |
|---|---|

Form 450
Rev 8/22

| Pistol | 830 Fulton Ave, Lansdale PA |
|--------|------------------------------|
|        |                              |
|        |                              |
|        |                              |

**WHEREFORE**, Petitioner asks this Court for the following relief(s):

Prohibit the Respondent from committing any act of abuse against the Petitioner (or his or her minor children).

Order the Respondent to stay away from:

      X Petitioner

      X Petitioner's home

      X Petitioner's workplace

X    Other:    Petitioner's family's home.

Prohibit the Respondent from contacting or attempting to contact the Petitioner in any way, including, but not limited to, by phone, by the mail or by any other means.

A PFA Order typically lasts for 1-2 years. If you would like the order to last longer than 1 year, fill out the aggravating factors below to grant no contact relief for as long as reasonably necessary to prevent further acts of Domestic Violence up to and including a permanent order of Court pursuant to 10 *Del C.* §1045(f). **(Please use the space provided to date and detail these events)**

1.    Actions resulting in physical injury or serious physical injury to me (Petitioner) caused by the Respondent. *(Describe below.)*

Respondent struck me in the face (see video) and left scratches all over my body during unwanted acts of sex. Respondent also left bite marks on my chest and shoulder (see picture). Respondent also attempted to penetrate me with what she described as a wand on 12/2/23 I was recovering from a medical procedure and drugged. I later confided in a friend about the incident. Respondent said wand was made of "hawthorn wood and dragon heartstring core" and was related to Respondent's favorite Harry Potter fanfiction book. Petitioner feared repercussions verbally, physically, emotionally, and professionally as Respondent threatened to tell coworkers that Petitioner enjoyed some of these sexual acts and would only believe the Respondents story. Respondent would take advantage of me when I was medicated and do sexual things that I did not ask for or consent to.

Respondent has claimed to have images to use against me if I ever step out of line."

2.    The use of a deadly weapon or dangerous instrument against me (Petitioner) by Respondent. *(Describe below.)*

Respondent threatened me with a knife.

Form 450
Rev 8/22

3. A history of repeated violations of prior protective orders by the Respondent. *(Describe below.)*

I believe the Respondent has had PFA's in the past and has still attempted to contact the person. Respondent said "I ruined all of their lives" when speaking about other instances of domestic abuse.

4. Prior convictions for crimes against me (Petitioner) by the Respondent. *(Describe below.)*

5. Exposure of any member of the my (Petitioner's) family or household to physical injury by the Respondent. *(Describe below.)*

6. Any other acts of abuse towards me (Petitioner) which the court believes constitute an immediate and ongoing danger *(Describe below.)*

I reported Respondent and her friend to the police and in retaliation Respondent attempts to have charges brought against me. The police have decided not to charge and the Respondent then got a PFA. I believe the PFA will be dismissed in just two weeks but fear what will happen when it does. I want the respondent to stay away and no longer harm me physically, verbally, emotionally, or professionally.

Order that the Petitioner be given the exclusive use and possession of the parties' residence at:

Order the Respondent to pay $ _____ to the Petitioner as compensation for losses

Form 450
Rev 8/22

     Suffered as a direct result of the domestic violence.

     Award temporary custody and/or residency of the parties' minor child(ren) to the Petitioner (please specify names and date of birth of the child(ren)).  **YOU MUST INCLUDE FORM 346 – CUSTODY SEPARATE STATEMENT IF THIS BOX IS CHECKED:**

_____   _____

_____   _____

     Order the Respondent to pay temporary support for the child(ren).

        Order the Respondent to pay $ _____ support for the Petitioner.

     Order the Respondent to pay or reimburse fees and costs.

     Award the Petitioner temporary possession of the following personal property (including but not limited to motor vehicles, checkbooks, keys and other personal effects listed below):

_____

     Order the Respondent to be evaluated by a certified domestic violence treatment agency and follow all recommendations for treatment and counseling.

        Other: _____

_____

_____

The Petitioner also asks the Court for any other such relief that the Court deems appropriate and just.

04/12/23
_____
Date

_____
Petitioner/Petitioner's Attorney

Form 450
Rev 8/22

## VERIFICATION

STATE OF DELAWARE              )

                              )   ss.:

COUNTY OF        New Castle    )

_____ Edwin Leon _____ , being duly sworn, says:

    I am the Petitioner in this action.  I have read the above Petition and know to the best of my knowledge that the

Facts contained therein are true.

_____
                                        Petitioner

Subscribed and sworn before me on this date,

_____              _____
        Date                           Clerk of Court/Notary Public

Form 677
Rev 8/21

# The Family Court of the State of Delaware

In and For ☒ New Castle County ☐ Kent County ☐ Sussex County

## UNSWORN DECLARATION

DIRECTION TO THE FILING PARTY: Attach this form with any filings that are submitted without being notarized.

As of July 1, 2020, and pursuant to Section 3927 of Title 10, Family Court Standing Order #3, and Rule 79.2 of the Family Court Rules of Civil Procedure, except as noted below, as related to pleadings and papers filed in Family Court, Unsworn Declarations may be used in lieu of verifications, sworn declarations, affidavits, and notarized signatures.   An Unsworn Declaration **may not** be used with:

(a) Parental Consents to any of the following: Termination of Parental Rights, Permanent Guardianship, or Guardianship,

(b) Consent Parentage Decrees, or

(c) Consents filed in an Adoption Proceeding.

**Unsworn Declaration Made Under Penalty of Perjury**

Pursuant to Section 3927 of Title 10 of the Delaware Code, Family Court Standing Order #3, and Rule 79.2 of the Family Court Rules of Civil Procedure, I declare under penalty of perjury under the laws of Delaware that the allegations contained in the below listed documents are true and correct.

Executed on the ____12____ day of _____April_____ , ____2023____ .

_____Edwin Leon_____
Printed Name

_____ /s/ Edwin Leon _____
Signature
(Electronic signature is permitted -- sign as "/s/Your Name")

**List all Court Forms and Documents that accompany this Unsworn Declaration:**

| |
|---|
| 240 |
| 654 |
| 450 |
| |
| |
| |
| |
| |
| |
| |

1:35



Chey

Sat, Dec 24, 2:06 AM

I know i shouldn't be stalking because it does nothing for my peace of mind but i AM because i cant sleep and I was hoping it'd give me a glimpse into where we are on the crazy scale... i obsessively use pinterest which he knows because i showed him how to use it over the summer and i just looked at his profile a few days ago to block him, since then he's added a whole boars of poems from MY favorite poet (the one i showed you the print from in the elevator) i feel so fucking insulted that he genuinely thinks i'm that easy to manipulate

he made the stupid board 7 hours ago

Sat, Dec 24, 10:32 AM

Girl I hope you slept in

What did he think? You'd see that and immediately decide to call him or something?? That is insulting, I agree



girl i was getting SO close to calling to make sure u wete alive lol

Message

1:42

CG

Chey

Kati Fernandez – executive at ESPN.
They met on vacation in Mexico and
dated for several months in 2021.
Broke up around Oct 2021.

**Daniela**

Followed by **gabbiemouriz** and **sabrinaaespinal**

Follow

**This account is private**
Follow this account to see their photos and videos.

Suggested for you                    See all

×                          ×

**Lex Loco**              **JuJu**              **Lana**
lexlocoband          jigg_yktv_          h3art_mrr

Follow                    Follow                    Foll

They casually dated around approx
February - April 2021.

2022*

Thu, Dec 29, 11:26 AM

**4 Photos**

iMessage

Cash

Messages - Chey Goodman

Ayou okay?

?

?? 

Hello?

12/14/22, 8:02 AM

sorry my mom called lol

All good. I'm going to take bug for a walk on a few  Want me to wait or call you back when I'm back?

I'll call!!

Wait when lol

Like after the walk

I'll just text when I'm back

12/14/22, 9:35 AM

Hi?

12/14/22, 5:20 PM

Don't leave

I'll be here til like 6:15

why

12/15/22, 4:59 PM

Who is Alexis again

Who?

12/15/22, 10:21 PM

?

12/16/22, 8:59 AM

https://www.abc.net.au/everyday/should-you-ever-have-sex-when-you-dont-feel-like-it/12484234

Messages - Chey Goodman

12/11/22, 6:50 PM

I'm feeling very self conscious about my pins now

Are you deleting some?

no haha i meant because i just pinned a bunch of stuff

harry potter themed stuff

as if u needed another reason to call me a nerd

One of the best things about you

ah yes, my endless harry potter knowledge

Also she didn't answer

if i send u a fanfic will u read it or is that too much lol

she sucks

I would after next week

Also, the wedding is a hard no.   No matter what, right?

what do you mean

okay, i'm going to email you some

Just if I could convince you

are you stalking my wedding board

12/11/22, 10:00 PM

edwin

Yes

you didnt open my snap

I was getting ready for bed/shower

Oh

Form 450
Rev 8/22

# The Family Court of the State of Delaware

## Resources for Domestic Violence Victims

**Domestic Violence Advocacy Program**

Court-based advocates have offices in each of the Family Court buildings and are available to help victims through the PFA process.  Advocates can also accompany victims to hearings, help develop safety plans and provide resource information.

**Domestic Violence Advocacy Programs:**
New Castle County:        (302) 255-0420
Kent County:                   (302) 672-1075
Sussex County:              (302) 856-5843

**24-hour Domestic Violence Hotlines** (shelter and support):
New Castle County:        (302) 762-6110 –English & Español
Kent/Sussex:                  (302) 422-8058
                                          (302) 745-9874 --Español

**24-hour Child Abuse and Neglect Hotline:    1-800-292-9582**

**Elder and Dependent Adult Abuse Hotline:  1-800-223-9074**

**Legal Assistance**

You <u>may</u> be eligible to receive help from an attorney.  For assistance with the PFA process, call:

*New Castle County:*        DE Volunteer Legal Services:          (302) 478-8680

*Kent County:*        Community Legal Aid Society, Inc.:          (302) 674-8500

*Sussex County:*    Community Legal Aid Society, Inc.:          (302) 856-0038

For an evaluation and determination of eligibility for other legal services visit:
<u>https://delegalhelplink.org</u>

**Your Virtual Hearing: Zoom Cheat Sheets, Guides, Other Information**

Your PFA hearings may be held virtually by telephone or video conferencing.

For Zoom Meeting Instructions visit:  courts.delaware.gov/family/zoom.aspx

For information about the PFA process visit:  courts.delaware.gov/family/pfa/index.aspx

For Court closures and other important announcements visit:  courts.delaware.gov/family

**Crime Victim Resources**